REAVLEY, Circuit Judge:
The United States seeks False Claims Act[1] penalties from the owners of an apartment project for falsely certifying that the property was decent, safe, and sanitary in requesting supplemental rent payments funded under Section 8 of the United States Housing Act.[2] The district court granted summary judgment for the owners,[3] and a panel of this court remanded for trial.[4] Those decisions addressed the materiality of the allegedly false certifications and the issue whether the owners knowingly submitted false claims. We do not reach those questions because we hold that, on this record, no false claims were made. We therefore affirm the judgment for the owners.
BACKGROUND
The National Housing Act of 1934[5] was enacted to encourage private industry to provide housing for low-income families.[6] It authorizes the U.S. Department of Housing and Urban Development (“HUD”) to guarantee private mortgage loans to construct new housing and rehabilitate old structures for “families with incomes so low that they could not otherwise decently house themselves.”[7] Private property owners receiving the nonrecourse mortgages must enter into a “regulatory agreement” with HUD which specifies “rents, charges, and other methods of operation, in such form and in such manner as in the opinion of the Secretary [of HUD] will effectuate the purposes of this section.... ”[8] In 1937, the United States Housing Act[9] was enacted to provide housing by making payments directly to local housing authorities. Section 8 was added to this Act in 1974 to authorize the making of “assistance payments” to encourage private property owners to provide housing.[10] *672 The amount of these assistance payments (made directly to the private property owners in the form of a subsidy) is determined by what the tenants can afford to pay, and what the private property owner could otherwise expect to charge under the prevailing market rates.[11] To receive assistance payments the property owner must enter into a housing assistance payment contract (“HAP Contract”).[12]
In 1980, Defendants-Appellees W. Thad McLaurin, Charles C. Taylor Jr., and Arthur W. Doty (“the Owners”) executed an agreement called the “Regulatory Agreement for Insured Multi-Family Housing Projects (With Section 8 Housing Assistance Payment Contracts)” (“the Regulatory Agreement”). Under this agreement, HUD promised to guarantee the Owners’ obligation under the mortgage used to purchase an abandoned apartment complex— the Jackson Apartments — and also to subsidize tenants’ rent payments in accordance with a subsequently-executed HAP Contract. The Owners, in turn, agreed to substantially rehabilitate the property and to keep it “in good repair and condition.” The property was rehabilitated using the proceeds of a $2.4 million nonrecourse mortgage loan guaranteed by the United States. The Owners invested $190,000 of their own funds in the project.
Under the HAP Contract, the Owners agreed to “maintain the [property] ... to provide Decent, Safe, and Sanitary housing.” The contract also required that the Owners make monthly requests for housing assistance payments. In each request — called a “HAP voucher” — the Owners were required to give the details of occupied apartments and the supplemental rental payments due, and certify that “to the best of [their] knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, [and] (ii) all other facts and dates on which the request for funds is based are true and correct....”
Both the Regulatory Agreement and the HAP Contract explained HUD’s remedies if the Owners failed to comply with the contracts’ terms. The Regulatory Agreement stated that upon violation of any of its parts HUD may give written notice of such violation. If the Owners failed to take corrective action, HUD was authorized to declare a default, and, among other things, to request that the mortgagee bank declare the Owners’ note due and foreclose on the property. The HAP Contract required that HUD inspect the property at least once a year to see that the Owners were maintaining the units in decent, safe, and sanitary condition. In the event that HUD notified the Owners in writing that the property was not in decent, safe, and sanitary condition, and the Owners thereafter failed to take corrective action within the time prescribed in the notice, HUD was authorized to exercise any of its rights and remedies under the contract, including the abatement of housing assistance payments.
From 1981 until 1997 the Owners submitted HAP vouchers in accordance with the HAP Contract and HUD paid the vouchers. Up until 1993 the record does not indicate that the property ever failed to pass HUD’s yearly inspections. But by 1993 the property was deteriorating and had become the center of criminal activity. In August 1993 the property received a “below average” rating during HUD’s yearly inspection. The report stated that repair and maintenance in many areas was urgently needed, and noted that the property, like many in its area, was experienc *673 ing a problem with illegal drug activity. HUD’s letter advising the Owners of the results of this inspection requested that the Owners respond in writing to the deficiencies noted and include a detailed explanation of their planned corrective measures.
In August 1994 HUD undertook both a management review and a physical inspection. The management received a “satisfactory” rating and the report stated that “[m]anagement is to be commended for the steps taken and planned to provide a more secure environment for the residents.” However, as a result of the physical inspection, HUD gave the property a “below average” rating. The report stated that many of the deficiencies noted in 1993 had not been corrected. Of the 18 units inspected, all but two needed immediate repairs, although each unit was deemed passable under HUD’s “Housing Quality Standards.”[13] The report detailed numerous corrective actions required and, for each, listed an estimated cost and time frame for correction. Several months later HUD wrote, “It is understood that funds are not readily available for repairs,” but asked that the Owners be mindful of the safety of tenants and workers and that “hazardous” deficiencies be addressed as soon as possible.
After 1994, the Owners devoted all rental income and subsidies to mortgage payments and property maintenance and repairs. They took no further distributions for return on their investment in the property.
In 1995 the property was rated “below average” for the third time, and all of the inspected units failed to meet HUD’s Housing Quality Standards. Again, corrective action was prescribed with an estimated cost and time frame for each. Many of the deficiencies were the same as those in 1993 and 1994. The report warned that if the property was not brought into compliance within 30 days further subsidy payments “may be jeopardized.” HUD’s letter transmitting the report to the Owners warned them that “[t]he Department does not allow management to continue at this level of performance.”[14]
In late 1996 HUD gave the property the lowest rating — “unsatisfactory.” The report said there were “compelling reasons” for this rating, including the fact that every inspected unit failed to comply with HUD’s Housing Quality Standards. The report again cataloged the property’s deficiencies and, for each, listed the necessary corrective action along with an estimated cost and time frame. The report also noted, however, that the property staff were “very cooperative throughout the physical inspection.” The letter that accompanied this report stated that the property could not continue to operate in its present condition, and that failure to make corrections *674 “could result in the denial of future participation” in HUD-sponsored housing programs. However, in another letter HUD wrote, among other things, “We look forward to working with you in an attempt to bring this property back to satisfactory condition.”
HUD’s last inspection was in May 1997. For the second time HUD gave the property an “unsatisfactory” rating. HUD again cataloged each of the property’s deficiencies and advised the Owners that “[t]he Department does not allow management to continue at this level of performance.” In August 1997, the Owners wrote that they were discontinuing mortgage payments due to lack of funds, and that the property was being turned over to HUD. They offered to manage the property for no charge until control could be transferred. The Owners managed the property without compensation until after the property was auctioned in July 1998.
The United States initiated this proceeding on August 5, 1998. The United States claims that the Owners violated the civil False Claims Act because 19 HAP vouchers they submitted between July 1995 and January 1997 falsely certified that the property was decent, safe, and sanitary.[15] The United States argues that each certification constitutes a “false claim for payment or approval ... within the meaning of 31 U.S.C. § 3729(a)(1),” and also a “false statement and/or record within the meaning of 31 U.S.C. § 3729(a)(2).” The certifications had been used to secure $865,023 in housing subsides, and because the United States claimed that the certifications were knowingly false when made, it sought treble damages, for a total of about $2.5 million.
DISCUSSION
The civil False Claims Act, 31 U.S.C. § 3729, in relevant part states:
(a) Liability for certain acts. — Any person who—
(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]
(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Govern-ment_
is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....
As the preceding statutory text shows, and as the name of the Act suggests, the Act is aimed at false claims. The statute defines a “claim” as “any request or demand, whether under a contract or otherwise, for money or property”[16] which is made to someone — including the government itself — who will at least in part use government money or property to pay it. Stated differently, it is a “request or demand” made in connection with a “contract or otherwise,” the “contract or otherwise” allegedly warranting the making of the claim. Thus, whether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it. It is only those claims for money or property *675 to which a defendant is not entitled that are “false” for purposes of the False Claims Act. See Costner v. URS Consultants, Inc., 153 F.3d 667, 677 (8th Cir.1998) (“[0]nly those actions by the claimant ... [calculated to] caus[e] the United States to pay out money it is not obligated to pay ... are properly considered ‘claims’ within the meaning of the FCA.”); United States ex rel. Wilkins v. N. Am. Constr. Corp., 173 F.Supp.2d 601, 626 (S.D.Tex.2001) (collecting authorities for the proposition that a “false claim” is a claim for more than one is due).
In this case unless the Owners submitted claims for money to which they were not entitled no False Claims Act liability arises. Although § 3729(a)(2) prohibits the submission of a false record or statement, it does so only when the submission of the record or statement was done in an attempt to get a false claim paid. There is no liability under this Act for a false statement unless it is used to get false claim paid.[17]
When we apply this law to the HAP Contract and the course of conduct between HUD and the Owners, we conclude upon this record that the Owners were entitled to the housing assistance payments sought and, thus, they made no false claims.

The Contract

“Decent, safe, and sanitary” is a meaningful and useful description of homes and apartment houses, but it is not precise or measurable. There will be wide difference of opinion of what is, and what is not, decent, safe, or sanitary. Just look at the current attire of people in our society to see the variations in notions of decency. Consider the plight of an owner who could be subject to False Claims Act liability by certifying that his 120 apartments are decent, safe, and sanitary when on any given day a United States Attorney could decide to the contrary, and perhaps ultimately convince a jury to agree. That owner would be forced to walk away from the property at an early sign of deterioration. If no one else were willing to incur the risk of False Claims Act liability, tenants would lose their housing. That state of affairs would be unacceptable to all parties and wholly inconsistent with federal housing policy.
Furthermore, if enforcement of the condition of the property were left to False Claims Act sanctions, consider the burden of the U.S. Attorney who must prove that the owner has knowingly certified falsely. It would not suffice that government employees, or even jurors, describe the property as less than decent. The burden would be to prove the state of mind of the owner: that he knew he could not honestly describe the property as “decent, safe, and sanitary.”
Fortunately for everyone, these problems are avoided by the terms of this contract between the Owners and HUD where the mechanism is spelled out for controlling the abatement of the payments, and the entitlement of the Owners, when the condition of the property deteriorates.
Section 1.7 to the HAP contract, in relevant part, provides as follows:
c. Units Not Decent, Safe, and Sanitary. If the Government notifies the Owner that he has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within *676 the time prescribed in the notice, the Government may exercise any of its rights under the contract, including the abatement of housing assistance payments, even if the Family continues to occupy that unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and the Government does not have other section 8 funds for such purposes, the Government may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. Where this is done, the Owner shall be notified that he will be entitled to resumption of housing assistance payments for the vacated units if (1) the unit is restored to Decent, Safe, and Sanitary condition, (2) the Family is willing to and does move back into the restored unit, and (3) a deduction is made for the expenses incurred by the Family for both moves.
d. Notification of Abatement. Any abatement of housing assistance payments shall be effective as provided in written notification to the Owner. The Government shall promptly notify the Family of any such abatement.
Thus, according to the HAP Contract, if the property is not decent, safe, and sanitary and HUD chooses to work with the Owners to remedy the property’s condition, the Owners remain entitled to housing assistance payments until HUD provides written notice, prescribes a time for corrective action, and notifies the Owners that they have failed to take the necessary corrective action within the specified time period.[18]
The United States does not contend that an abatement of payment by HUD was ever exercised. The central position of the United States in this litigation has been that the claims for housing assistance payments submitted by the Owners during the period covered by the complaint, July 1995 through January 1997, were false claims, i.e., claims for payments to which the Owners were not entitled, because during this period the Owners were in breach of their obligation under the HAP Contract to provide decent, safe, and sanitary housing. What this ignores is that the HAP Contract explicitly addresses a breach of this nature and provides a specific remedy: when the Owners are notified by HUD that they have failed to maintain the property in decent, safe, and sanitary condition and that corrective action must be taken within the time specified in the notice, the Owners continue to be entitled to receive housing assistance payments during the corrective action period and until HUD notifies them in writing that they have failed to take the necessary corrective action and that housing assistance payments will be abated. During the corrective action period, then, claims for housing assistance payments are not false claims because they are claims for money to which the Owners are entitled (and which provide the wherewithal both to operate the property and to take the necessary corrective actions).

*677
Course of Conduct

The exchanges and conduct of the parties demonstrated that housing assistance payments continued in an effort to keep the apartments habitable and to provide the means to take the corrective action requested by HUD. During the period of time covered by the complaint, July 1995 through January 1997, there was significant evidence that the property was increasingly uninhabitable, and that HUD had concluded that the property had fallen below the decent, safe, and sanitary standard. At the same time, HUD was willing to work with the Owners to continue with their efforts to bring the property back into compliance. Moreover, HUD seemed to recognize that the property’s noncompliance was at least partially explained by a lack of funds and nearby criminal activity. In 1995, perhaps recognizing the lack of funds for routine maintenance and repairs, HUD asked the Owners to at least address “hazardous” deficiencies that presented a danger to the safety of tenants and workers. In 1996, following the property’s receipt of its lowest rating to date, HUD wrote that it was “looking] forward to working with you in an attempt to bring this property back to satisfactory condition.”
The undisputed conduct and exchanges by and between the parties during this entire period demonstrates, not only that the vouchers were promptly paid, but that all parties regarded them as entitled to be paid.
CONCLUSION
We hold that under the HAP Contract and on this record the Owners were entitled to receive the housing assistance payments that they sought during the corrective action period at issue. Their claims therefore cannot be false under the False Claims Act as a matter of law. The judgment of the district court is AFFIRMED.

. 31 U.S.C. § 3729 (2003).

. 42 U.S.C. § 1437f(a) (Supp.2003).

. 95 F.Supp.2d 629 (S.D.Miss.2000).

. 288 F.3d 665 (5th Cir.), vacated on reh’g en banc, 307 F.3d 352 (5th Cir.2002).

. Pub. L. No. 73-479, 48 Stat. 1246 (codified as amended in scattered sections of 12 U.S.C. §§ 1701-1750g (2001 & Supp.2003)).

. 12 U.S.C. § 17157 (2001).

. 12 U.S.C. §§ 1703, 1701t (2001).

. 12 U.S.C. § 17152(d)(3) (2001).

. Pub. L. No. 75-412, 50 Stat. 889 (codified as amended at 42 U.S.C. § 1437 et seq. (2000 & Supp.2003)).

. Pub. L. No. 93-383, 88 Stat. 662 (codified as amended at 42 U.S.C. § 1437(f) (Supp. 2003)).

. 42 U.S.C. §§ 1437a(a)(l), 1437f(c) (Supp. 2003).

. 42 U.S.C. § 1437f(c) (2000 & Supp.2002); 24C.F.R. § 811.102 (2002).

. As the district court noted, during the time period at issue, the Housing Quality Standards to which HUD referred did not apply to the particular Section 8 program covering the Owners' property, but they were apparently used by HUD as a guideline for measuring the condition of the property.

. In March 1996, the U.S. Attorney began forfeiture proceedings against the property for its role in facilitating illegal drug activity. In a subsequent letter, the U.S. Attorney threatened to bring claims against the Owners individually for violation of the civil False Claims Act, citing the their allegedly "false” monthly certifications that the property was decent, safe, and sanitary. However, he offered to nonsuit — and to bring no further claims — if the Owners agreed to surrender the property to the government's designee. The Owners immediately agreed to do this, but the record does not explain why the U.S. Attorney took no further action — probably because HUD could find no one else to take the property.

. Southland Management Corp. managed the properly and has since been dismissed as a party.

. 31 U.S.C. § 3729(c).

. See Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 184 (3d Cir.2001) (stating that the FCA “was not intended to impose liability for every false statement made to the government”).

. During this corrective action period, the HAP Contract clearly contemplates the continued application for and receipt of housing assistance payments, with no modification to the contractual requirement that the Owners certify in the monthly HAP voucher that the property is decent, safe, and sanitary. In this respect, the HAP Contract is perhaps internally inconsistent, but in view of its provisions, it is at least understandable how the Owners could have continued to use the HAP voucher form with its contractually required certification that the property is decent, safe, and sanitary.