**UNITED STATES of America, ex rel. Werner STEBNER, Plaintiff–Relator,**

v.

**STEWART & STEVENSON SERVICES, INC. and Mclaughlin Body Company, Defendants.**

No. C.A.H–96–3363.

United States District Court, S.D. Texas, Houston Division.

Jan. 30, 2004.

---

Michael F. Hertz, Washington, DC, Jill O. Venezia, Office of U. S. Attorney, Stuart M. Nelkin, Nelkin and Nelkin, Houston, TX, for Plaintiffs.

Daniel M. McClure, Fulbright & Jaworski, Glen M. Boudreaux, Kirklin Boudreaux et al., Houston, TX, for Defendants.

## MEMORANDUM AND ORDER

HOYT, District Judge.

## I. INTRODUCTION

This is a *qui tam* action that alleges that the defendants have committed fraud against the United States in violation of the False Claims Act ("FCA"). 31 U.S.C. § 3729 *et seq.* The Court accepts jurisdiction under 28 U.S.C. § 1331. The plaintiff-relator ("relator") is Werner Stebner and the defendants are Stewart & Stevenson Services, Inc. ("S & S") and its subcontractor, McLaughlin Body Company ("MBC"). Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, the parties have submitted cross motions for summary

judgment. The Court has reviewed the papers on file and concludes that the relator's motions for summary judgment on the issue of liability should be DENIED and the defendants' motions for summary judgment should be GRANTED.

## II. HISTORY

In 1991, the Government awarded S & S a contract to produce 10,843 trucks for the Army. The contract required that the trucks be capable of resisting corrosion damage during the initial ten years of service life. To evaluate resistance, the contract required an Accelerated Corrosion Test ("ACT"). In 1995, the ACT revealed corrosion problems. Seeking to establish conditional acceptance criteria while resolving the corrosion issue, S & S and the Government executed the first of several bilateral modifications on January 19, 1996. Modification P00067 called for a root cause analysis and the submission of a corrective action plan. The modification authorized the Government to withhold partial payments while conditionally accepting trucks until S & S submitted and implemented an acceptable corrective action plan. Moreover, it gave the Government the right to cease conditional acceptance if S & S failed to sufficiently resolve the corrosion issue. S & S selected its employee, the relator, to lead the investigation and produce the final corrosion report. Prior to submitting his report, the relator met with S & S managers and Government representatives. His report disclosed that S & S and MBC's facilities were producing "junk" and were incapable of meeting the contract's requirements. The relator and S & S disagreed about the level of detail to include in the final report. S & S subsequently removed the relator from the investigation and reassigned the reporting task. On April 2, 1996. S & S submitted the final corrosion report. It identified more than a dozen potential corrosion causes and it proposed various actions for corrosion prevention. It did not, as the relator preferred, reveal every deficiency in the production process and each instance of additional corrosion discovered during the investigation.

After testing repairs that were made under the corrective action plan, the Government, on September 25, 1996, exercised its right to cease conditional acceptance. In response, S & S offered a ten-year warranty on repaired trucks if the Government would continue accepting them. Meanwhile, on October 8, 1996, the relator filed an FCA Complaint with this Court under seal; the United States declined to intervene. Accepting S & S's offer, the Government executed Modification P00124 on November 13, 1996. In addition to resuming acceptance, the Government agreed to release all previously withheld funds. Since this event, the Government has awarded S & S two additional contracts for trucks, and the repaired ones remain under warranty against corrosion.

## III. PARTY CONTENTIONS

### A. Werner Stebner's Argument

The relator contends that S & S violated the FCA by submitting payment claims for trucks supplied under its contract with the Government while failing to ensure complete compliance with the contract's terms. Specifically, the relator contends that S & S submitted DD250 invoices and progress payment requests for trucks known to be incapable of meeting the contract's corrosion resistance requirements. Moreover, the relator contends that S & S's subcontractor, MBC, violated the FCA by falsely certifying to S & S that its products and processes conformed to the Government's contract. Finally, the relator contends that S & S violated the FCA by accepting MBC's false certifications.

### B. S & S and MBC

S & S contends that it submitted no false claims for payment. Supporting this contention, S & S asserts that the DD250 invoices do not certify perfect compliance and that the progress payment invoices reflect manufacturing costs rather than payment for any particular truck. S & S and MBC jointly contend that the certifications provided by MBC were exclusively for S & S. MBC's certifications were not submitted to the Government nor did they impact the Government's payment decisions. S & S further contends that the Government's knowledge of the manufacturing processes and corrosion issues precludes fraud or falsity. Finally, S & S contends that the relator's FCA claim fails because the Government negotiated specific contractual modifications to solve the corrosion issue.

## IV. LEGAL STANDARDS

### A. Summary Judgment under Rule 56(c)

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In adjudicating a motion for summary judgment, the Court must view all facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v.*

*Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings" and designate "specific facts" in the record "showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists. *Saunders v. Michelin Tire Corp.,* 942 F.2d 299, 301 (5th Cir.1991).

The primary inquiry here is whether the material facts present a sufficient disagreement as to require a trial, or whether the facts are sufficiently one-sided that one party should prevail as a matter of law. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. The case's substantive law identifies the material facts. *Id.* at 248, 106 S.Ct. 2505. Only disputed facts potentially affecting the outcome of the suit under the substantive law preclude the entry of a summary judgment. *Id.*

### B. False Claims Act ("FCA")

The FCA, in relevant part, provides:

(a) Liability for certain acts.—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent

claim paid or approved by the Government; . . .

is liable to the United States Government . . . .

31 U.S.C. § 3729(a)(1), (2).

For FCA purposes,

'knowing' and 'knowingly' mean that a person with respect to the information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts

in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).

FCA liability arises only from the submission of false or fraudulent "claims." Congress has established that a

'claim' includes any request or demand, whether under a contract or otherwise, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c).

Whether a claim is "false or fraudulent" depends upon the materiality of the alleged falsity or fraudulence at issue. FCA liability does not occur unless the act averred to be false or fraudulent is material to the monetary or property claim submitted to the Government. In fact, FCA liability does not exist if the alleged fraudulent act had no bearing on the Government's payment decision.

## V. ANALYSIS

### A. S & S submitted no expressly false or fraudulent claims to the Government.

■ The relator avers that S & S's FCA liability stems from the submission of DD250 invoices and progress payment invoices. The DD250 invoices were payment requests for completed trucks and the progress payment invoices were payment requests for manufacturing cost reimbursements. Such requests for payment fit squarely within the FCA's definition of a 'claim.' See 31 U.S.C. § 3729(c). FCA liability, however, requires coinciding falsity or fraudulence. In addition to the delivered quantity, the DD250 invoices included limited information about the trucks such as mechanical specifications and manufacture dates. Verified and signed by a Government contracting officer, each DD250 invoice is prima facie evidence that S & S produced and delivered the product for which payment was requested. The relator has produced no evidence that any DD250 invoice expressly claimed to deliver something more than what the Government actually received.

Finding evidence of an overt false or fraudulent claim in the progress payment invoices is an equally futile endeavor. The relator contends that these invoices were false or fraudulent claims because they contained express certifications of contract compliance. It is true that each progress payment invoice contains a certification of contractual compliance. Read completely, however, each certification merely represented that S & S complied with the contract's progress payment clause. Nothing in the certification addressed the quality of any particular truck or conformance with any particular production term in the contract. Completing the certification essentially affirmed that the progress payment

invoice was true. Each invoice stated the costs that S & S was eligible to receive under the progress payment clause and a computation of the amount that remained for future progress payments. The relator has not demonstrated that an entry on any invoice for progress payments was false or fraudulent. In fact, no evidence suggests that S & S requested a reimbursement for eligible costs that it did not incur. Accordingly, the Court finds that there is no genuine dispute regarding the absence of an express false or fraudulent claim.

*B. S & S submitted no implied false or fraudulent claims to the Government.*

■ Considering the conspicuous absence of an express false or fraudulent claim, the relator submits that FCA liability arises from what S & S omitted rather than from what it claimed. Citing *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 200 F.Supp.2d 673 (S.D.Tex.2002), the relator argues that "implied certification" is a viable theory for finding FCA liability. In *Riley*, this Court held that certifications may be express or implied. *Riley*, 200 F.Supp.2d at 678. Exercising restraint, however, this Court only considered *Riley's* justiciable issues and did not provide a rubric for identifying implied certifications.

Relying on *BMY—Combat Systems Division of Harsco Corp. v. United States*, 38 Fed.Cl. 109 (1997), the relator maintains that an implied certification occurs whenever a government contractor submits a DD250 form as an invoice for payment. A review of the court's analysis in *BMY— Combat* plainly belies this assertion.

In *BMY—Combat*, the plaintiff-contractor ("contractor") defended an FCA counter-claim by arguing that "in the absence of falsity on its face, a DD250 form cannot constitute a false claim under the False

Claims Act." *Id.* at 124. Distinguishing two of the contractor's supporting cases, the court rejected this contention that, for FCA purposes, DD250 certifications must be express. Comparing *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir.1995), the court held that DD250 forms are claims under the FCA when used as invoices. *Id.* Next, the court contrasted the propriety of identifying express falsity on DD250 forms in criminal cases, which require proof beyond a reasonable doubt, with the burden for finding liability in civil matters. Distinguishing *United States v. Cannon*, 41 F.3d 1462 (11th Cir.1995), the court held that an "implied representation may be sufficient for a finding of fraud under a preponderance standard." *Id.*

The relator is in error because he failed to appreciate the actual significance of the court's analysis. The court's distinctions demonstrate that DD250 forms become claims when used as invoices and, like other invoices in civil matters, they may impliedly certify false claims. Regarding whether certifications may be express or implied, *BMY—Combat* advances the ball no further than *Riley*. *BMY—Combat* merely puts DD250 forms on par with other instruments used as invoices. The relator's attempt to elevate DD250 forms above all other invoices by creating a *per se* rule of implied certification is unavailing.

Although it misses the relator's proposed mark, *BMY—Combat* does, however, provide instructive insight into the implied certification issue. In *BMY— Combat*, the contractor agreed to manufacture howitzers for the U.S. Army. The Government accepted DD250 forms as invoices and each expressly required the contractor to identify any contractual deficiencies or nonconformance areas. *BMY—Combat*, 38 Fed.Cl. at 117. The

contractor, however, failed to disclose that testing was not performed. Consequently, the court held that this omission was an implied certification for FCA purposes because the lack of testing was a material fact. The court's review indicates that there are at least two prerequisites for establishing that a contractor's invoice contains an implied certification for FCA purposes: (1) the invoice represents that the contractor has disclosed deficiencies or nonconformance areas and (2) the contractor submits the invoice without disclosing a material deficiency or area of nonconformance.

*BMY—Combat's* path to finding an implied certification reveals a distinction overlooked by the relator but significant to the Court. In the instant matter, the relator asserts that S & S invoiced the Government for vehicles that were manufactured with inferior processes, maintained in a sub-standard environment, and inadequately tested for corrosion resistance. Perhaps acknowledging an inability to predict future performance, the relator avers that these factors assure corrosion within ten years. Therefore, according to the relator, the vehicles do not conform to the contract's ten-year corrosion resistance requirement. Notwithstanding an apparent lack of ripeness, the relator's argument fails because, in contrast to the contractor in *BMY—Combats*, S & S submitted no invoice with a requirement that it disclose all deficiencies and nonconformance areas. This prong was the bridge that the *BMY—Combat* court used to access its theory of implied certification. Without it, the issue of misrepresenting a material fact never matures. Likewise, without a textual commitment to full disclosure on the invoice, the relator's argument that an implied certification exists falls upon ears that do not hear very well.

## C. The FCA requires a knowingly made material misrepresentation.

Throughout his submissions to the Court, the relator has relentlessly argued in favor of applying the square corners rule. This rule binds those who contract with the Government to the letter of their agreements. *U.S. ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 302–304 (6th Cir.1998). In light of the relator's fervent desire to apply a purely contractual concept to this fraud action, it would be ironic if the measure that he would deal should become the measure that he receives. The difference between the DD250 invoices that S & S submitted and those discussed in *BMY—Combat* turns on one clause. In *BMY—Combat,* each invoice explicitly requires the contractor to identify nonconformance areas. The invoices submitted by S & S, however, merely represent that government representatives have identified nonconformance areas. Following *BMY—Combat's* analysis for finding an implied certification and the relator's penchant for legalism, this matter should end here. The Federal Rules of Civil Procedure, however, demand more. *See,* FED. R. CIV. P. 1. Fairness endows the issue of whether a material misrepresentation exists with primacy over finding implied or express certifications. In fact, parties should not attempt to split hairs over whether an implied or express certification exists. Arguing opposite sides of the same coin amounts to mere quibble that demeans the severity of a claim that one party has defrauded the Federal Government.

■ Notwithstanding any additional promises or certifications, a contractor's mere request for full payment inherently represents that he has tendered a complete and conforming performance. In this regard, it was unnecessary for the court in *BMY—Combat* to identify the

contractor's specific promise on the DD250 form because any request for full payment represents that the Government has received the benefit of its bargain. Accordingly, this Court holds that a request for full payment becomes a material misrepresentation when the Government does not receive the benefit of its bargain. Indeed, an FCA violation occurs when the contractor 'knowingly' makes a material misrepresentation.

*D. S & S made no material misrepresentation because the Government received the benefit of its bargain.*

 In light of the preceding, the first step in finding an FCA violation must be to establish whether the Government has received the benefit of its bargain. If it has, then no false or fraudulent claim exists and summary judgment for the defendant is appropriate. If not, then a material misrepresentation has occurred and the court must determine whether the contractor knowingly made the misrepresentation.

It is undisputed that the Government bargained for vehicles that will resist corrosion for ten years. The relator avers, however, that the tendered vehicles do not provide the required protection. Therefore, based upon his assessments of the anti-corrosion test results and vehicle production processes, the relator concludes that the Government has not received the benefit of its bargain. The relator's submission includes evidence that no vehicle successfully completed the contract's accelerated corrosion test requirement. It also includes evidence that vehicle surfaces, as contractually required, were not properly cleansed, treated, and free from foreign matter that might affect corrosion resistance.

At best, the relator's submission on testing reflects a limited probability that some vehicles may need repairs within ten years. The contract, however, contemplates the need for corrosion repairs and requires S & S to provide them at its own expense. Lacking evidence that S & S intends to renege on this warranty, the relator's submission fails to demonstrate nonconformance that deprives the Government of its bargain. This conclusion follows *BMY—Combat* and makes an appropriate distinction. In *BMY—Combat,* the contractor failed to structurally test howitzers supplied to the U.S. Army. It is an understatement to suggest that personnel would be in danger if any cannons imploded on the battlefield. In fact, neither party in *BMY—Combat* disputed that the lack of testing was a material fact. This finding does not exist in the instant matter. Here, S & S argues that it performed adequate testing. Moreover, competent evidence demonstrates that the testing was merely a means to "evaluate the effectiveness of current designs and materials in preventing corrosion of military vehicles [and to] derive cost data to reflect inspection and repair costs ...." Family of Medium Tactical Vehicles ("FMTV") Contract §§ E.47.3–47.3.1. Finally, whether complete testing occurred or not in this matter is a fact that hardly affects the Government's bargain because no one can reasonably suggest that the premature occurrence of rust on a military transport vehicle compares to the material defect associated with untested howitzers.

The Government's bargain is also unaffected by allegations that vehicle surfacing processes were less than perfectly compliant with subjective production quality terms. The Fifth Circuit addressed this issue in *United States v. Southland Management Corp.,* 326 F.3d 669 (5th Cir. 2003) (*en banc*). In *Southland,* the owners of an apartment complex contracted with the Government to provide housing for low-income residents. The contract

provided that the owners would receive housing assistance vouchers in exchange for providing "[d]ecent, [s]afe, and [s]anitary housing." *Id.* at 672. In its claim, the Government alleged that the owners violated the FCA by submitting vouchers with false certifications of compliance. Rejecting the Government's FCA allegation, the court held that " '[d]ecent, safe, and sanitary' . . . is not precise or measurable." *Id.* at 675.

In the instant matter, the relator claims that S & S requested payments while failing to ensure compliance with the contract's TT–C–490 and MIL–STD–193K specifications. These terms addressed manufacturing quality and effectively called for proper cleaning, treatment, and protection of all parts from foreign matter that might affect corrosion resistance. Taken to an extreme, conformity requires that vehicle construction take place in a dustless vacuum. In light of *Southland* and common sense, this Court finds that a subjective propensity renders these terms immaterial to this issue. The Government's concern when it accepted the tendered vehicles was not whether the defendants rinsed every part of every vehicle before each coating application. Its concern was whether it received corrosion resistant vehicles.

Besides illuminating the path to discerning material issues, *BMY—Combat* and *Southland* provide a basis for considering a contractor's willingness to stand by its agreement and the Government's decision to revoke or continue its acceptance. These factors are critical to the determination of whether the Government received the benefit of its bargain. In *BMY—Combat*, it is significant to note that the Government was the defendant in the contractor's suit against it for equitable adjustment. It appears that the Government was willing to work with the contractor to repair defective units. In fact, the Government did not revoke its acceptance until the contractor sought payment for the repairs. *Southland* further establishes this point. In its discussion, the Fifth Circuit considered two aspects of the relationship between the defendant apartment complex owners and the Government. First, when the Government inspected the housing units and found poor conditions, the defendants respected the terms of the contract, accepted responsibility, and implemented various corrective measures. Second, throughout multiple corrective action periods that all ended with marginal success, the Government declined to abate housing assistance payments. Instead, it chose to continue accepting payment requests while working with the defendants to improve residential living conditions. Ultimately, the United States brought suit and the Fifth Circuit held that no FCA violation occurred because the alleged fraud was within the scope of the contract and the dealings between the parties demonstrated that the defendants were entitled to be paid. *Southland*, 326 F.3d at 676.

The instant matter squarely fits the *Southland* analysis. Moreover, the distinctions in this case demonstrate why the *BMY—Combat* result does not apply. In all three cases, the Government had the opportunity to revoke its acceptance either by abating housing assistance payments or by rejecting conditionally accepted goods. Permanent revocation occurred only in *BMY—Combat*. In fact, it occurred only after the defendant attempted to avoid its remedial obligation. In *Southland* and in the instant matter, the Government withheld its contractual right to permanently revoke acceptance because the defendants made earnest attempts to remedy apparent deficiencies. Finally, the Fifth Circuit's characterization of the Government's continuing decision to accept and pay

vouchers as honoring entitled payment requests is consistent with basic contract theory: if one party performs to an extent that the other party receives the benefit of its bargain, then surely the initially performing party is entitled to request and receive payments as provided in the contract.

In *Southland,* the Government's decision to continue working with the defendants demonstrates its belief that the defendants were entitled to the payments and, inherently, that the Government regarded itself as receiving the benefit of its bargain: housing for low-income residents. Likewise, the Government's past and continuing decision to work with S & S reflects that it regards itself as receiving the benefit of its bargain: vehicles that will resist corrosion for ten years.

Ample evidence demonstrates that the Government's contract with S & S contemplated not only instances of deviation of the nature considered here, but also a working relationship between the parties to implement essential remedies. Specifically, the contract provides, in relevant part, that

> [d]eviation from the prescribed, or agreed upon procedure, or instances of poor practices ... will immediately be called to the attention of the contractor. Failure of the contractor to promptly correct deficiencies shall be cause for suspension of acceptance until corrective action has been made, ...
>
> . . . . .
>
> Upon completion of the corrosion test, the Government shall evaluate the test results and corrective action(s) proposed by the Contractor.... All corrective actions shall be at no cost to the Government.

FMTV Contract §§ 4.1.3, E.47.9. Notwithstanding the relator's averments that vehicles were improperly tested, undisputed evidence shows that S & S conducted appropriate tests and made no attempts to suppress deficiencies. In fact, S & S detailed its shortcomings in a 38–page report containing 36 exhibits that identified more than a dozen possible causes of corrosion. As authorized by the contract, S & S implemented corrective actions at no cost to the Government. One of these actions included making repairs to vehicles that showed corrosion. Like the *Southland* defendants, S & S experienced failure. When subsequent tests revealed that this corrective measure might not last, the Government exercised its right to suspend acceptance. Although no suspension occurred in *Southland,* the analysis remains consistent because the suspension never matured to a permanent revocation and the Government continued working with S & S.

In addition to providing suspension rights, the Government's contract with S & S provides that "suspension of acceptance will last *until corrective action has been made,* ..." FMTV Contract § 4.1.3. Prior to this suit, S & S offered to provide a formal ten-year warranty on all repaired vehicles. Affirming that the offer was a bona fide corrective action, the Government resumed its acceptance. Despite the relator's best efforts to maintain his saucy intrusion, the Government and S & S have continued to work together. For instance, modification P00124 called for complete vehicle galvanization. The relator contends that it violated the FCA because S & S requested (and received) an equitable adjustment for it. There is no violation, however, because the modification provides *more* than the Government's original expected benefit. The modification guarantees twenty years of corrosion resistance. Finally, the Government's decision to issue S & S two contract renewals speaks volumes about its level of satisfaction.

Considering the Government's dealings with S & S and relevant precedent, the relator's evidence does not support a finding that the Government failed to receive the benefit of its bargain. Lacking a factual basis to establish that S & S misrepresented a material fact when it sought payment from the Government, the relator has failed to establish the occurrence of a false or fraudulent claim. Without a false or fraudulent claim, FCA liability, as a matter of law, does not attach to S & S or its subcontractor, MBC.

## VI. CONCLUSION

In light of the discussion above, the Court DENIES the relator's motions for summary judgment and GRANTS the defendants' motions for summary judgment. All other motions are moot.

It is so ORDERED.