United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 8, 2005**

Charles R. Fulbruge III
Clerk

CORRECTED

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

-----------

**No. 04-20209**

-----------

**United States of America, ex rel., WERNER STEBNER,**

**Plaintiff-Appellant,**

**versus**

**STEWART & STEVENSON SERVICES, INC.; MCLAUGHLIN BODY CO.,**

**Defendants-Appellees.**

-----------

**Appeal from the United States District Court
for the Southern District of Texas
(4:96-CV-3363)**

-----------

Before KING, Chief Judge, BARKSDALE, and STEWART, Circuit Judges.

PER CURIAM:[*]

For this action under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, Relator Werner Stebner challenges: (1) the summary judgment awarded Stewart & Stevenson Services, Inc. (S&S), and McLaughlin Body Co. (MBC); and (2) the costs awarded S&S. Concerning the summary judgment, Stebner contends the defendants submitted false and fraudulent claims to the United States during the course of a military contract. The judgment is **AFFIRMED**; the appeal from the costs-award, **DISMISSED**.

-----------

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

In 1991, the Government contracted with S&S to build a Family of Medium Tactical Vehicles (FMTV); they were a variety of models of two-and-a-half ton to five-ton military trucks (cargo, dump, tractor, and wrecker) with enclosed cabs. S&S contracted with MBC to produce the cabs. From 1993 until 1998, S&S produced FMTVs under the relevant contracts. (The Government has since awarded S&S two more FMTV contracts.) One specification requires that FMTVs be free of corrosion during the first ten years of use.

To monitor the FMTVs' production, the Government established a Defense Plant Representative Office (DPRO) adjacent to S&S's Sealy, Texas, manufacturing plant. Approximately 30 Government personnel were assigned to that DPRO: contract specialists helped administer the contract and oversaw any modifications or revisions; property specialists maintained FMTVs delivered and stored in Sealy; and quality assurance specialists audited and monitored manufacturing processes and assembly of the vehicles and conducted 100% vehicle inspection and testing.

Contract payment was conducted as follows. S&S submitted monthly progress payments for up to 85% of its costs for producing FMTVs that month. Upon conditional acceptance of a vehicle, S&S invoiced the Government for 90% of its total contract price, from which the Government deducted the 85% attributable to the progress payment. Upon final acceptance, the Government paid S&S the

balance. Progress-payment invoices were submitted on Government Standard Form 1443, which contained a certification that the costs reflected on the form were actually incurred by S&S or would be incurred. The vehicle-acceptance documents included Government form DD250 ("Material Inspection and Receiving Report"), the Vehicle Inspection Record, and the Final Inspection Record. The on-site Government officials reviewed and completed these forms and inspected the FMTVs. Upon the Government's being satisfied with a vehicle, its representative signed the DD250, indicating conditional or final acceptance. All documents were then returned to S&S, which converted the DD250 into an invoice and submitted it for payment. The DD250 contained no express certifications of contractual compliance. (Only Government officials' signatures appeared on the DD250.)

The Government accepted the FMTVs in stages; acceptance of produced vehicles was conditional prior to the Government's granting First Article Approval (FAA) for full-scale production. Vehicles presented to the Government for conditional acceptance were stored in a Government-controlled area at the Sealy plant until FAA was granted. It was not granted until the vehicle design passed a series of tests; the test results informed design modifications. During the life of the contract, the Government and S&S agreed to numerous amendments which specified needed vehicle modifications suggested by the various test results.

3

Conditionally-accepted vehicles not in accordance with the final design were retrofitted to conform, then re-submitted for approval.

After a final design was agreed upon in 1995, S&S began retrofitting the conditionally-accepted vehicles. During the retrofit, S&S found corrosion problems on the cabs and cargo beds of many of the vehicles. S&S informed the Government immediately. In response, on 19 January 1996, S&S and the Government negotiated modifications, which, *inter alia*, required S&S to: produce a Cab Corrosion Report disclosing the corrosion's "root cause"; repair vehicles that had certain corrosion levels; and refrain from submitting for acceptance vehicles with severe corrosion. The modifications allowed S&S to submit certain vehicles for acceptance but allowed the Government to withhold up to $2,000 per conditionally-accepted vehicle.

At around the same time, the FMTV was being subjected to the contractually-mandated Accelerated Corrosion Test (ACT), which simulated the required ten-years of corrosion-free use. The tested vehicle failed the ACT. Because the vehicles' cabs, manufactured by MBC, exhibited most of the corrosion, S&S and Government inspectors began investigating MBC's production facility and processes. Stebner, as the S&S employee in charge of the Cab Corrosion Report, also inspected the FMTVs and MBC's facility. He found internal and external cab corrosion on the vehicles; blamed inadequacies at MBC's production facility and its use of faulty

4

products and sealing procedures; and concluded MBC's corrosion-prevention coating product and processes did not conform to contractual requirements and produced "junk".

S&S instructed Stebner not to include the totality of his assessment in the Cab Corrosion Report, but to say the systems were only bad "some of the time". Stebner refused, and was removed from the project. In any event, the Government was aware of the conditions at MBC's facilities; officials from both DPRO and other Government offices inspected the facilities and determined MBC's processes were inadequate. The Government also knew of other possible sources of corrosion, such as faulty windshield seals. The Cab Corrosion Report was presented to the Government on 2 April 1996.

Approximately six months later, after two retrofitted vehicles failed testing for the negotiated corrosion-repair, the Government suspended conditional acceptance of any vehicles evidencing corrosion or which had undergone corrosion repair. After further negotiations, the Government and S&S agreed on two contract modifications. The Government would resume acceptance if S&S: (1) provided a ten-year corrosion warranty, capped at $10 million, on vehicles already manufactured or being manufactured (entered November 1996); and (2) modified the contract to provide fully galvanized cabs (entered March 1997). The Government agreed to increase the price for the galvanized-cab vehicles because it believed galvanization would extend the vehicles' corrosion-free

5

life-span past the contracted-for ten years. The Government considered these two modifications the "final resolution of the corrosion problems".

Pursuant to the False Claims Act (FCA), Stebner filed this action under seal on 8 October 1996, after the Government suspended all acceptance but before the corrosion settlement was reached. In his 19 March 1997 second amended complaint, Stebner claimed S&S and MBC made false representations and certifications to the Government with intent to defraud and made "misleading minimization in reports to the Government of known systemic problems in the coating and cleaning process of the FMTV". This action was stayed pending appellate review of **United States ex rel. Riley v. St. Luke's Episcopal Church**, 982 F. Supp. 1261 (S.D. Tex. 1997) (individuals lack standing to file FCA claims on behalf of the United States); was administratively closed in November 1997; but was re-opened on Stebner's 1 June 2000 motion, following the Supreme Court's decision in **Vermont Agency of Natural Res. v. United States ex rel. Stevens**, 529 U.S. 765 (2000) (individuals have standing to file FCA claims on behalf of the United States). On 29 August 2000, the Government elected *not* to intervene in this action.

In 2001, the district court granted S&S's motion to dismiss for failure to state a claim, following our precedent in **Riley**, 196 F.3d 514 (5th Cir. 1999) (*qui tam* provisions of FCA unconstitutional). **United States ex rel. Stebner v. Stewart &**

6

*Stevenson,* No. H-96-3363 (S.D. Tex. 13 March 2001)(unpublished). After a different result was reached for *Riley* in *en banc* proceedings, *see* *Riley*, 252 F.3d 749 (5th Cir. 2001)(en banc), our court summarily vacated the district court decision in this action and remanded*. See* *United States ex rel. Stebner v. Stewart & Stevenson*, No. 01-20272 (5th Cir. 2 July 2001)(unpublished).

On remand, the parties filed cross-motions for summary judgment. S&S contended: (1) it submitted no false claims within the meaning of the FCA; (2) the Government's knowledge of the manufacturing processes and corrosion issues precludes any claim of falsity; and (3) Stebner's claims are barred by the contractual resolution of the corrosion problem. S&S and MBC jointly contended the certifications provided by MBC applied only to its contract with S&S, not to compliance with S&S's contract with the Government.

In moving for summary judgment, Stebner contended: S&S filed DD250 and progress payment claims for vehicles it knew did not meet the contract's corrosion standards; MBC violated the FCA by falsely certifying to S&S that the cabs and production processes complied with the contract; and S&S violated the FCA by accepting MBC's false claims.

The district court awarded summary judgment to S&S and MBC, concluding: S&S did not submit false claims, either express or implied, to the Government; and there were no false claims because

7

there was no material misrepresentation to the Government and it received the benefit of the bargain. *United States ex rel. Stebner v. Stewart & Stevenson*, 305 F. Supp. 2d 694 (S.D. Tex. 2004).

## II.

Stebner challenges the summary judgment and the costs awarded S&S. We address the summary judgment first.

## A.

A summary judgment is reviewed *de novo*. *E.g.*, *GDF Realty Investments, Ltd. v. Norton*, 326 F.3d 622, 627 (5th Cir. 2003), *cert. denied*, 125 S. Ct. 2898 (2005). Such judgment is proper when "there is no genuine issue as to any material fact and ... the [movant] is entitled to a judgment as a matter of law". FED. R. CIV. P. 56(c); *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All inferences must be drawn in favor of the nonmovant, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); but, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).

Stebner asserts violations under the following FCA provisions:

> (a) Liability for certain acts. – Any person
> who –

8

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
> ... is liable to the United States Government for a civil penalty....

31 U.S.C. § 3729(a)(1), (a)(2). The FCA defines "claim" as "any request or demand, whether under a contract or otherwise, for money or property". 31 U.S.C. § 3729(c). "It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." ***United States v. Southland Mgmt. Corp.***, 326 F.3d 669, 674-75 (5th Cir. 2003) (en banc) (citation omitted).

Stebner asserts: the district court interpreted too narrowly the meaning of "claim"; an FCA violation has occurred when, as here, goods do not conform to contractual specifications but invoices are submitted to the Government. Stebner contends the district court failed to analyze sufficiently the summary judgment evidence as to MBC and erred when it concluded: there was no implied certification in the DD250 or progress reports; MBC's certifications to S&S were not false claims under the FCA; and there can be no false claim where the Government has received the benefit of its bargain.

9

S&S and MBC respond: Stebner fails to identify any false claims; the Government's contractual resolution with S&S negates any alleged false claims; there was no knowing submission of false claims because the Government was informed of all corrosion problems; and Stebner cannot establish that the claims, if false, were material to the Government's decision to pay.

Based upon our review of the record and the parties' briefs and oral arguments, summary judgment in favor of S&S and MBC was appropriate. The claims S&S submitted to the Government were the progress payment requests and the Government-signed DD250. Neither expressly certified compliance with every provision of the overall contract. Our court has not adopted an implied theory of certification. *See* **U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.**, 336 F.3d 375, 381-82 (5th Cir. 2003). Even if we were to do so, FCA liability would not attach in this action. The Government was involved in the design, production, testing, and modification of the FMTVs; and S&S and the Government negotiated contract modifications in response to the well-documented corrosion problem. The Government retained, and exercised, its discretion to conditionally accept or refuse to accept FMTVs that did not meet contractual standards; and the DD250 was not signed by the Government until it was ready to accept a vehicle. *See* **Southland**, 326 F.3d at 675. As a result, S&S's subcontractor, MBC, did not

10

"cause[] a prime contractor to submit a false claim to the Government". ***United States v. Bornstein***, 423 U.S. 303, 309 (1976).

B.

Concerning his challenge to the approximately $ 42,000 in costs awarded S&S, Stebner filed a notice of appeal from the 2 February 2004 judgment on 1 March 2004, after S&S had filed its bill of costs on 17 February and Stebner had filed a motion on 27 February for review of costs. On 7 April, the district court granted S&S's original bill of costs.

That 7 April decision was an independently appealable order. *See* ***Pope v. MCI Telecomm. Corp.***, 937 F.2d 258, 266-67 (5th Cir. 1991). "Where the appellant notices the appeal of a specified judgment only ... this court has no jurisdiction to review other judgments or issues which are not expressly referred to and which are not impliedly intended for appeal." ***Id.*** at 266 (internal quotation and citations omitted); FED. R. APP. P. 3(c)(1)(B) (notice of appeal must "designate the judgment, order, or part thereof being appealed"). Stebner's 1 March notice of appeal specifies appeal only from the 2 February judgment. Because he failed to file a supplemental notice of appeal, specifying the 7 April costs-award, we lack jurisdiction to review this issue. *See* ***Pope***, 937 F.2d at 266-67.

11

III.

For the foregoing reasons, the judgment is **AFFIRMED**; the appeal from the costs-award, **DISMISSED**.

*AFFIRMED IN PART; DISMISSED IN PART*