**UNITED STATES of America EX REL. Joshua HARMAN, Plaintiff,**

v.

**TRINITY INDUSTRIES, INC. and Trinity Highway Products, LLC, Defendants.**

**CASE NO. 2:12–CV–00089–JRG**

United States District Court, E.D. Texas, Marshall Division.

Signed June 9, 2015

738

Barrett E. Pope, Debbie Grace Seidel, Wyatt B. Durrette, Jr., DurretteCrump PLC, Richmond, VA, Christopher M. Green, Boies Schiller & Flexner, Armonk, NY, George F. Carpinello, Jeffrey S. Shelly, Teresa A. Monroe, Boies Schiller & Flexner LLP, Albany, NY, George R. Coe, Karen Caudill Dyer, Boies Schiller & Flexner, LLP, Orlando, FL, J. Kevin McClendon, Us Attorney's Office, Plano, TX, Jennifer Leigh Truelove, Samuel Franklin Baxter, McKool Smith, Josh Blackshear Maness, Attorney at Law, Justin Kurt Truelove, Truelove Law Firm, Marshall, TX, Nicholas A. Gravante, Jr., Boies Schiller & Flexner, New York, NY, Steven Ross Lawrence, The Lawrence Law Firm, Austin, TX, Thomas John Ward, Ward, Smith & Hill, PLLC, Longview, TX, for Plaintiff.

Ethan L. Shaw, Moore Landrey LLP, Austin, TX, Matthew B. Kirsner, Eckert Seamans Cherin & Mellott, LLC, Richmond, VA, Russell Clay Brown, James Mark Mann, Mann Tindel & Thompson, Henderson, TX, Anne M. Johnson, George Walter Bramblett, Jr., Jeremy D. Kernodle, Nina Cortell, Haynes & Boone, LLP, Heather Bailey New, Bell Nunnally & Martin LLP, James C. Ho, Prerak Shah, Robert Anthony Vincent, Gibson Dunn & Crutcher LLP, Sarah Rae/Brandt Teachout, Akin Gump Strauss Hauer & Feld LLP, Dallas, TX, Brian T. Ross, Robin C. Gibbs, Gibbs & Bruns, Manuel Lopez, Robert M. Roach, Jr., Roach & Newton LLP, Houston, TX, Elizabeth Dulong Scott, Akin Gump Strauss Hauer & Feld, Longview, TX, Jessica Greenwood, Akin Gump Strauss Hauer & Feld, New York, NY, John W. Newton, III, Newton & Kebodeaux LLP, Beaumont, TX, Mike C. Miller, Attorney at Law, Marshall, TX, Wendy West Feinstein, Eckert Seamans Cherin Mellott, Pittsburgh, PA, for Defendants.

## *MEMORANDUM OPINION AND ORDER*

RODNEY GILSTRAP, UNITED STATES DISTRICT JUDGE

Before the Court is the Renewed Rule 50(b) Motion for Judgment as a Matter of Law filed by Trinity Industries, Inc. and Trinity Highway Products, LLC (collectively, "Trinity") (Dkt. No. 596). Having considered the motion, the related briefing in support of and in opposition to the same, the oral arguments presented by counsel, and all of the materials in the record, the Court finds that Trinity's motion should be and hereby is **DENIED** in all respects.

## I. INTRODUCTION AND PROCEDURAL HISTORY

On March 6, 2012, Joshua Harman (hereinafter, "Harman") filed the complaint in this action as a *qui tam* Relator, on behalf of the United States of America, pursuant to 31 U.S.C. §§ 3729–32, otherwise known as the False Claims Act (FCA). (Dkt. No. 1). Harman alleged that Trinity violated the provisions of the FCA by knowingly and falsely certifying that Trinity's guardrail end terminals, known as the "ET–Plus" or "ET–Plus units," manufactured after 2005 had been crash tested and approved for federal reimbursement by the Federal Highway Administration (FHWA). Harman further alleged that such false certifications were necessary in order to induce the U.S. government to pay money and that the U.S. government did, in fact, pay such money when it reimbursed individual states for the costs associated with installing ET–

Plus units on federally funded or subsidized highways.

A first jury trial in this action commenced on July 14, 2014. (Dkt. No. 385). However, following a series of sharp practices and other procedural irregularities, the Court was compelled to declare a mistrial. *See* (Dkt. No. 384).[1] Subsequently, the Court conducted a second, six-day jury trial which commenced on October 13, 2014. On October 20, 2014, the jury returned a unanimous verdict, finding that Trinity "knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim" in violation of the FCA. (Dkt. No. 570). The jury further found that the United States government sustained damages as a result of Trinity's violations, in the amount of $175,000,000. (*Id.*)

In the instant motion, Trinity asks the Court to set aside the jury's verdict and render Judgment as a Matter of Law (JMOL) in favor of Trinity on all of the allegations and claims asserted by Plaintiff. (Dkt. No. 596). In doing so, Trinity makes two primary arguments:

(1) that Harman failed to introduce legally sufficient evidence that Trinity met the elements of an FCA claim; and

(2) that, regardless of the sufficiency of the evidence, the FHWA has determined that the ET–Plus was and is eligible for federal reimbursement and that this eligibility determination means that—as a matter of law—a claim for reimbursement for the ET–Plus cannot be "false" for purposes of the FCA.

Of these two arguments, Trinity relies most heavily on the latter. Specifically, Trinity claims that the decision in *United States v. Southland Management Corp.*,

326 F.3d 669, 674–75 (5th Cir.2003) (en banc), forecloses any possibility of recovery in this case because the FHWA has, at all relevant times, accepted the ET–Plus as eligible for reimbursement by the government. For the reasons stated below, Trinity misunderstands and misapplies the holding in that case and also attempts to use facts developed after the trial—which are wholly outside the record—to collaterally attack the jury's verdict. Ultimately, this Court is persuaded that *Southland* dealt with very different facts than those at issue in this case and that the holdings of both the majority and concurrence in *Southland* cannot support Trinity's attempt to escape the jury's verdict that it knowingly defrauded the government.

However, the facts established at trial—including the history of the ET–Plus units at issue and the efforts Trinity underwent to obtain "acceptance" for their use on federally funded highways—provide much of the context necessary for an evaluation of Trinity's eligibility arguments under *Southland*. Accordingly, the Court will first address Trinity's sufficiency-of-the-evidence contentions, in order to provide such context.

## II. LEGAL STANDARD

■■■ Under Rule 50, the Court may enter JMOL when it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue." Fed. R.Civ.P. 50(a). In other words, "[Rule 50(a) ] allows the trial court to remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.' " *Weisgram v. Marley Co.*, 528 U.S. 440, 447–48, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) (Ginsburg, J.) (quoting 9A Charles

---

**1.** The circumstances leading to the Court's decision to declare a mistrial are largely irrel-

evant to Trinity's motion under Rule 50(b) and, as such, are not recited here.

A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2521 (2d ed.1995)). If the Court declines to grant a motion for JMOL brought under Rule 50(a) and submits the case to the jury, a party can file a "renewed" motion for judgment as a matter of law under Rule 50(b).

 When deciding such a motion under Rule 50, the Court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party. Importantly, the Court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Accordingly, a Court may set aside a jury's verdict and grant a motion for judgment as a matter of law "only if the jury's factual findings are not supported by substantial evidence or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Am. Home Assurance Co. v. United Space Alliance, LLC,* 378 F.3d 482, 486–87 (5th Cir.2004). In other words, the jury's verdict must stand if "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Id.* (quoting *Liberty Mut. Ins. Co. v. Falgoust,* 386 F.2d 248, 253 (5th Cir.1967)).

## III. FACTS ESTABLISHED AT TRIAL

In order to understand the import of the jury's verdict and the motion now before the Court, it is necessary to review the history of the ET–Plus units at issue in this case, as well as Trinity's efforts to obtain FHWA approval to use the ET–Plus on the national highway system.

### A. All roadside hardware, including guardrail end terminals, must be accepted for use by the FHWA before being eligible for reimbursement using federal funds.

The federal government, through the FHWA, works with state departments of transportation to develop highway construction programs. (Dkt. No. 577 at 123:7–20). As part of such programs, the federal government reimburses states for the expenses incurred by their contractors. (*Id.*) However, roadside hardware must be crash tested [2] and accepted by the FHWA in order to qualify for such reimbursement. (Dkt. No. 577 at 145:2); (Dkt. No. 579 at 30:5–17).

The FHWA determines which tests must be run in order to obtain the approval required for reimbursement. (*Id.*); (Dkt. No. 580 at 51:9–53:22). The hardware actually installed on the highway system must "replicate the crash-tested device," and any changes to such hardware must be reviewed by and agreed to by the FHWA. (Dkt. No. 577 at 145:21–146:19).

### B. Trinity sought and obtained approval for use of the "standard" 5–inch ET–Plus on the highways in January 2000.

It is undisputed that in 1999 Trinity sought approval from the FHWA to begin placing the ET–Plus on federal highways. *See, e.g.,* (Dkt. No. 576 at 70:23–71:3); (Dkt. No. 577 at 124:4–14). At that time, the newly developed ET–Plus was intended to replace Trinity's previously approved guardrail end terminals, called the ET–2000. (*Id.*)

Substantial evidence at trial established the ET–Plus units that Trinity submitted

---

**2.** With respect to the ET–Plus units at issue in this case, the FHWA has required crash testing in accordance with the standards set out in the National Cooperative Highway Re-

search Program (NCHRP) Report 350. (Dkt. No. 577 at 123:7–20); (Plaintiff's Exhibit ("PX") 748 / Defendants' Exhibit ("DX") 03 (NCHRP Report 350)).

for approval in 1999 had specific properties and dimensions, including:

- a guide channel that was five (5) inches wide and thirty-seven and one-fourth (37–1/4) inches in height;

- an exit gap of at least one and one-half (1–1/2) inches;

- a throat inlet of four (4) inches; and

- a feeder channel height of fifteen and three-eighths (15–3/8) inches.

*See* (Dkt. No. 576 at 80:2–11, 102:13–106:11, 132:7–11); (PX–47); (PX–51). A representative example of such a standard 5–inch ET–Plus was introduced into evidence as Plaintiff's Exhibit 948.

Further, the guide channels on such 5–inch ET–Plus units were positioned flush against the throat and secured using a "butt weld." *See, e.g.,* (Dkt. No. 575 at 86:12–22, 87:18–24); (Dkt. No. 576 at 117:13–18). The configuration of the guide channels and the weld are observable upon inspection of the 5–inch ET–Plus. (PX–948).

On January 18, 2000, following a review of crash-test reports and other materials submitted by Trinity, the FHWA issued a letter agreeing that "the ET–PLUS can be used in lieu of the original ET–2000 extruder head on any of the ET–2000 systems previously accepted for use on the National Highway system." (PX–51).

### C. In 2005, Trinity began manufacturing and selling a "modified" 4–inch ET–Plus.

The evidence at trial also established that in or around 2005, Trinity modified the standard 5–inch ET–Plus, altering certain properties and dimensions. Such changes included at least:

- reducing the guide channel width from five (5) inches to four (4) inches;

- reducing the guide channel height from thirty-seven and one-fourth (37–1/4) to thirty-six and one-fourth (36–1/4) inches;

- narrowing the exit gap from at least one and one-half (1–1/2) inches to one (1) inch;

- lengthening the throat inlet from four (4) inches to four and three-eighths (4–3/8) inches; and

- reducing the feeder channel height from fifteen and three-eighths (15–3/8) inches to fourteen and seven-eighths (14–7/8) inches.

(Dkt. No. 577 at 80:2–11, 102:13–106:11, 132:7–11); (Dkt. No. 579 at 30:22–31:10, 32:2–34:25). A representative example of such a modified ET–Plus unit was introduced into evidence as Plaintiff's Exhibit 948.[3]

Further, in assembling the modified ET–Plus units, Trinity inserted the guide channels into the throat inlet and secured them using a "fillet weld" in lieu of the "butt weld" used in the standard 5–inch ET–Plus. *See, e.g.,* (Dkt. No. 576 at 81:3–82:8). The insertion of the guide channels into the throat, as well as the change to the weld, is observable upon inspection of the modified ET–Plus. (PX–948).

Given the procedural posture of this case, the Court reviews the evidence in the light most favorable to the jury's verdict. However, no inference need be made with respect to the facts recited above, as they have remained, at all times, essentially unchallenged. For instance, the physical exemplars of the standard 5–inch and modified 4–inch ET–Plus units were introduced in the first trial without objection

---

**3.** Both the modified ET–Plus and the standard ET–Plus were admitted as the same exhibit number–Plaintiff's Exhibit 948.

from Trinity. As Trinity's counsel stated at the pre-trial hearing conducted on July 10, 2014:

Plaintiff's 948. Your Honor, this is—this is being dealt with by the parties. This is actually a notation for physical ET–Plus heads, and it's my understanding the parties have an agreement on that. So we don't need to address that now.

(Dkt. No. 362 at 176:7–11); *see also* (Dkt. No. 394 at 27 (Relator's list of admitted exhibits from the first trial, listing PX–948 as an exhibit admitted into evidence during the trial)).

Before the second trial, Trinity raised perfunctory questions with respect to the "chain of custody" of such physical exhibits. However, Trinity failed to squarely challenge the authenticity or admissibility the evidence. *See* (Dkt. No. 523 at 181:23–185:3); (Dkt. No. 526 at 34:24–40:18 (counsel for Trinity arguing that "we were under the impression that the [physical exhibits] were used as demonstratives" despite their pre-admission as trial exhibits and inclusion on the Relator's trial exhibit list)). Further, Trinity made no effort in its briefing to challenge any of the facts recited above. In this context, the Court treats such facts as conclusively established and will proceed to the analysis of Trinity's arguments.

## IV. ANALYSIS—SUFFICIENCY OF THE EVIDENCE [4]

█ In order to prevail on an FCA claim, a relator must prove: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Longhi v. United States,* 575 F.3d 458, 467–468 (5th Cir. 2009) (internal quotations and citation omitted). As discussed below, Harman introduced substantial evidence in support of his contentions that Trinity met each of these elements.

### A. Substantial (and frequently un-rebutted) evidence supports the jury's verdict that Trinity made false statements or engaged in a fraudulent course of conduct.

█ In its motion, Trinity argues that the Court "mistakenly instructed the jury that it could find an FCA violation if there was a material change in the ET–Plus that was not disclosed to the FHWA." (Dkt. No. 596 at 13).[5] Trinity argues that such an instruction misstates the law and that Harman must present substantial evidence of an actual lie. (*Id.* (citing *Southland,* 326 F.3d at 682 (Jones, J. concurring))). However, in its motion, Trinity provides no citation to the trial transcript for such an allegedly erroneous jury instruction—because no such jury instruction was given. Rather, the Court provided a high-level summary of Harman's contentions to the *venire* panel during jury selection, stating as follows:

---

4. In addition to the arguments addressed in this section, Trinity relies on the *Southland* decision to argue that Harman cannot have introduced evidence sufficient to support the jury's verdict. *See, e.g.,* (Dkt. No. 596 at 14 (falsity), 17 (scienter), 19 (materiality), 20 (causation)). Trinity's *Southland* arguments are addressed below and, as such, will not be repeated for every element of Harman's FCA claims.

5. Where the Court cites to the docket and lists a page number, the Court is referring to the page of the docket entry and **not** to the internal pagination of the filing. In the case of the transcripts of the pre-trial and trial proceedings, this is a distinction without a difference; however, in the case of motions, attachments, and other filings (*e.g.,* Trinity's motion for JMOL) the reader should refer to the page listed in the docket.

Plaintiff [Harman] alleges that the Defendants violated the False Claims Act by fraudulently enticing the United States government to pay for the ET–Plus end terminal systems that were materially different in dimension and geometry from the end terminal system that was crash-tested in 2005 and accepted for use by the Federal Highway Administration.

(Dkt. No. 574 at 24:10–15). In addition to this brief, contextual statement, the Court's *preliminary* instructions to the jury included the following:

A central question in this trial will be whether the ET–Plus end terminal systems that the Defendants sold were substantially different than or essentially the same as the ones the FHWA approved in 2005.

(Dkt. No. 575 at 20:11–14).

At no point did the Court instruct the jury that a material, undisclosed change to the ET–Plus was sufficient to show a false statement or fraudulent course of conduct under the FCA. To the contrary, the Court's final jury instructions specifically instructed the members of the jury on all of the elements of a claim under the FCA. (Dkt. No. 584 at 34–47). In particular, the Court instructed the jury that, in order to find for Harman, the jury must first find that Trinity "made or used or caused to be made or used a false record or statement." (Dkt. No. 584 at 42:16–25). The Court clarified that "a record or statement is false if it is an assertion *that is untrue when made or when used*"—in other words, a lie. (*Id.* at 43:4–5 (emphasis added)). The Court further emphasized that, "[i]f the proof fails to establish any essential part of the Plaintiff's claim by a preponderance of the evidence, you should find for the Defendants as to that claim." (*Id.* at 43:1–3). After being so instructed, the jury rendered a verdict that Trinity "knowingly made, used, or caused to be

made or used, a false record or statement material to a false or fraudulent claim." As discussed below, that verdict is supported by substantial evidence.

**i. Trinity failed to disclose any of the modifications made to the standard 5–inch ET–Plus at any time before suit was filed.**

In July of 2005—at roughly the same time as it was modifying the ET–Plus units—Trinity conducted additional crash tests of an ET–Plus set at a raised height and provided a report of such tests to the FHWA. (PX–156); (Dkt. No. 577 at 125:10–16). After receiving said report, the FHWA issued a letter dated September 2, 2005, approving a "standard" ET–Plus for use on a 31–inch guardrail system. (PX–173).

However, the additional crash tests and corresponding report were not spawned by the changes to the ET–Plus terminal head. Instead, the reason Trinity ran the crash tests was to ostensibly test the standard 5–inch ET–Plus on a new, raised 31–inch high guardrail system, which was "soon [to] be adopted as a standard [guardrail system] by several states." (PX–156). As a result, Trinity's report disclosed none of the dimensional changes to the ET–Plus described above. (PX–156); (Dkt. No. 577 at 125:25–126:15); (Dkt. No. 580 at 134:3–136:4). Rather, every aspect of the report suggested that it was directed solely at obtaining FHWA acceptance of a "standard" ET–Plus for use with the new 31–inch guardrail systems. To-wit:

• The 2005 report is titled "NCHRP Report 350 Testing of the ET–Plus for 31–Inch–High W–Beam Guardrail." (PX–156).

• The abstract of the 2005 report states that "[s]everal modifications were made to the *standard* ET-PLUS to accommodate the 787 mm

(31–inch) high W-beam guardrail." (*Id.* (emphasis added)).

- The description of the test article lists seven modifications to the "*Standard* ET–PLUS guardrail terminal," including the increase in guardrail height and various changes to the posts, W-beam, anchor, and blockout depth needed to accommodate the change in guardrail height. (*Id.* (emphasis added)).

In contrast to the precise detail with which Trinity's 2005 report describes the modifications directed to the proposed change in guardrail height, the modified dimensions of the ET–Plus head itself are entirely omitted. Further, in forty separate places, this report identifies the test article as a "standard" ET–Plus (*i.e.*, the 5–inch ET–Plus approved in 1999). (PX–156); (Dkt. No. 581 at 199:22–200:4); (Dkt. No. 580 at 134:3–20). When confronted with these facts at trial, Trinity admitted that the 2005 report failed to expressly disclose the modifications to ET–Plus, and Trinity admitted that such modifications were not discussed in any communications with the FHWA pertaining to the report. (Dkt. No. 580 at 47:4–48:25).

Unsurprisingly, the FHWA's September 2, 2005, letter:

- expressly listed only the seven modifications covered by Trinity's 2005 test report concerning the changes to the standard ET–Plus needed to accommodate the raised guardrail system;
- expressly limited the 2005 approval to "[t]he modifications described above"—none of which included the undisclosed changes in guide channel width, guide channel height, exit gap width, throat inlet length, feeder channel height, or type of weld used;
- referred to the tested ET–Plus units as the "ET–Plus 31"; and

- excused Trinity from completing a full series of NCHRP Report 350 crash tests because "the original designs [*i.e.*, **the standard 5–inch ET–Plus**] for attachment to standard W-beam guardrail have proven to be crashworthy."

(PX–173).

At trial, after being confronted with these facts, Trinity admitted that it failed to disclose the modifications listed above to the FHWA at any time. *See, e.g.*, (Dkt. No. 580 at 32:12–20 (testimony of Greg Mitchell, on behalf of Trinity, admitting that "several" changes were made to the ET–Plus in 2005, none of which were reported to the FHWA)); (*Id.* at 50:7–24 (additional testimony of Greg Mitchell, further admitting that Trinity failed to disclose various changes to the ET–Plus at any time)); (Dkt. No. 581 at 214:7–12 (testimony of Dr. Eugene Buth, on behalf of Texas A & M, admitting that changes to the ET–Plus were not disclosed to the FHWA until 2012, if at all)). This testimony was then confirmed by the FHWA. (Dkt. No. 577 at 125:25–126:15 (testimony of Nick Artimovich, on behalf of the FHWA, stating that the agency first became aware of changes to the ET–Plus in 2012 when they were disclosed by Harman)). Further, Greg Mitchell, the President of Defendant Trinity Highway Products, speaking on behalf of Trinity, admitted that the description of the 2005 test article as a "standard" ET–Plus was false:

Q. Okay. And—and when the [2005] report was finally done, the report told the FHWA that we used a standard ET–Plus, correct?

A. That's correct.

Q. And that was false, correct?

A. It didn't consider the 5– to 4–inch change. It was a standard ET–Plus, yes.

Q. It was false, correct?

A. I don't know how to answer your question other than the fact than it was a standard ET–Plus.

Q. Was it true?

A. No.

Q. Okay. So it would be false?

A. Yes.

(Dkt. No. 580 at 48:12–25).[6]

Such admitted falsities are all the more striking given that the FHWA subsequently issued a letter that, on its face, limits any approval to the modifications expressly listed in the 2005 report and expressly recites the success of the "the original designs [*i.e.*, the standard 5–inch ET–Plus]" *as the reason for excusing Trinity from additional testing that would otherwise be required.* (PX–173).

### ii. Trinity falsely certified that the modified 4–inch ET–Plus had been accepted by the FHWA.

Despite making modifications to the ET–Plus in or around 2005, despite the omission of any mention of such modifications to the FHWA, despite the admittedly false references to the "standard" ET–Plus in the report, and despite the limitations and "original design[ ]" language in the FHWA's 2005 letter, Trinity continued to certify that the newly modified 4–inch ET–Plus units it sold were both NCHRP Report 350 compliant and accepted for use and reimbursement by the FHWA, under the agency's original letter issued in 2000, as well as the 2005 letter discussed above. *See, e.g.*, (Dkt. No. 579 a t 159:15–161:11); (Dkt. No. 580 a t 74:7–76:10); (PX–173); (PX–174); (PX–218); (PX–608); (PX–959).

In doing so, Trinity likewise certified that the ET–Plus units it was selling beginning in 2005 were identical to the articles tested in 1999 and 2005, disclosed to the FHWA, and approved for use. For example, Mr. Greg Mitchell, speaking on behalf of the defendants, testified that Trinity was required to certify that "the hardware furnished [the modified 4–inch ET–Plus sold for installation on the highways beginning in 2005] has essentially the same chemistry, mechanical properties, and geometry as that submitted for acceptance [to the FHWA]." (Dkt. No. 580 at 69:5–24).

In a second example, Plaintiff introduced letters from Trinity to the Vermont and Florida Departments of Transportation again certifying that the ET–Plus as sold was an exact match to the article tested, disclosed to the FHWA, and approved. In the Vermont DOT letter, dated February 17, 2006, Trinity claimed that:

The ET–2000 and the ET–Plus with HBA that are currently being furnished to the state of Vermont Agency of Transportation is *identical* in composition and test properties as approved by the FHWA.

---

6. Nevertheless, other representatives of Trinity and Texas A & M stated at trial that they intended to disclose the changes to the ET–Plus in 2005; sought to explain away the forty references to a "standard" ET–Plus as typographical errors; and insisted that the complete omission of any reference to the dimensional changes to the ET–Plus were the result of "an unfortunate mistake." *See, e.g.*, (Dkt. No. 578 at 35:3–9); (Dkt. No. 580 at 54:4–57:3). Neither Trinity nor Texas A & M could corroborate such testimony with any documents—*e.g.*, draft reports, emails, or notes. Confronted with such competing evidence, and with the benefit of the witnesses' presentation at trial, the jury was free to consider the testimony, weigh its veracity, and judge the credibility of Trinity and Texas A & M's witnesses. *Reeves*, 530 U.S. at 150–51, 120 S.Ct. 2097. In light of the verdict, the Court must infer that the jury rejected Trinity's "inadvertent accident" argument and concluded that Trinity actively concealed information from the FHWA—a conclusion for which there is substantial evidence. *See, e.g.*, (PX–156); (PX–133 (Trinity email disclosing Trinity's intention to modify the ET–Plus "without announcement")).

(PX–959 (emphasis added)); (Dkt. No. 580 at 71:20–72:3). In the Florida DOT letter, dated September 28, 2007, Trinity claimed that:

> There have been *no major design changes* that would affect the acceptance status with the FHWA. The FHWA has accepted the use of each of these products for use on the national highway system as a TL–3 product when such use is requested by a highway agency.

(PX–962 (emphasis added)); (Dkt. No. 580 at 72:13–73:7). Mr. Mitchell then confirmed that Trinity provided certifications of the FHWA acceptance and NCHRP Report 350 compliance through a host of certification documents provided to the states and to the purchasers of ET–Plus units. (Dkt. No. 580 at 69:25–71:17); *see also* (Dkt. No. 579 at 139:18–142:15 (testimony of Mark Stiles admitting that Trinity must certify the ET–Plus as approved by the FHWA in order to obtain reimbursement from the government, confirming that Trinity "provides a [NCHRP Report 350] certification when it sells an ET–Plus for a federally reimbursed highway," and identifying several such confirmations sent by Trinity)).

The certifications recited above were, admittedly, false. *See* (Dkt. No. 580 at 71:18–76:10). Even if Trinity had not admitted as much, the evidence recited above with respect to the several undisclosed changes to the ET–Plus provides the jury with substantial evidence from which to conclude that Trinity's post–2005 certifications of the ET–Plus as FHWA approved and NCHRP Report 350 compliant were false. Further, and as discussed below, Harman introduced substantial evidence that, not only did Trinity make such false certifications to its customers and state departments of transportation, it did so knowingly.

### iii. Trinity's false statements and fraudulent conduct were neither "debatable" nor matters of "good engineering judgment."

Trinity also argues that the jury's verdict cannot stand because the allegations regarding its statements and conduct "were subject to legitimate dispute and could not be objectively false." (Dkt. No. 596). This argument lacks merit.

As discussed above, substantial evidence supports the jury's verdict that Trinity consciously decided to: (1) modify the dimensions and properties of the ET–Plus in at least the six ways described above; (2) conceal such modifications from the FHWA; and (3) nevertheless certify to its customers and state departments of transportation that the ET–Plus units sold beginning in 2005 were "identical in composition and test properties" and had "essentially the same chemistry, mechanical properties, and geometry" as the "standard" ET–Plus tested in 1999. (PX–959); (Dkt. No. 580 at 69:5–24). However, through the President of Trinity Highway Products, Greg Mitchell, Trinity admitted at trial that such certifications were false. (Dkt. No. 580 at 48:12–25, 71:18–76:10).

Nevertheless, Trinity argues that it was not possible for the jury to have found that Trinity made any false statements because: (1) NCHRP Report 350 allows for design changes to roadside hardware; and (2) in making such "design changes," Trinity merely acted on the recommendations and "good engineering judgment" of Texas A & M. (Dkt. No. 596 at 16).

However, Harman introduced substantial evidence showing that Trinity—not Texas A & M—made the decision to modify the ET–Plus, conceal such modifications, and falsely certify that the ET–Plus units had been accepted by the FHWA. For example, Harman introduced an inter-

nal Trinity email exchange in which Trinity employees:

- discussed "pushing to change the ET to the 4? channel";
- considered the potential cost savings associated with that change;
- indicated that Trinity was "feeling we could make this change with no announcement"; and
- directed a Trinity employee to "start talking to [Texas A & M] about this."

(PX–133). Trinity's attempts to shield itself at the expense of Texas A & M are not only wholly self-serving, but also well beyond what the evidence supports.

Moreover, Harman introduced substantial evidence that the decisions outlined above were not based on "engineering judgment"—good or otherwise—from any source. Wade Malizia, the Trinity employee who claimed to have made the "prototype" ET–Plus used in the 2005 crash tests,[7] also testified that he was not an engineer and that he received no guidance whatsoever from engineers at Trinity or Texas A & M on how to construct the "prototype" ET–Plus that was allegedly tested. (Dkt. No. 576 at 77:17–83:20). Mr. Malizia further testified that the only changes he made to the "prototype" ET–Plus involved the substitution of the 4–inch guide channel in place of the standard 5–inch channel. (*Id.* at 78:4–8). Mr. Malizia makes no mention of other changes made to the modified 4–inch ET–Plus units sold beginning in 2005 (*e.g.*, the narrowed exit gap).[8]

In the face of such substantial evidence, Trinity relies on conclusory and uncorroborated testimony from employees of Texas A & M, claiming that it was Texas A & M—not Trinity—that determined what changes to make to the ET–Plus and what changes to disclose to the FHWA. *See* (Dkt. No. 578 at 6:3–17, 57:5–58:24 (Dr. Roger Bligh)); (Dkt. No. 581 at 156:12–158:14, 181:24–182:2 (Dr. Eugene Buth)). However, those same Texas A & M employees testified that they:

- gave no direction to Mr. Malizia with respect to the construction of the "prototype," (Dkt. No. 578 at 7:4–6);
- transmitted no drawings to Trinity illustrating the alleged design changes made at Texas A & M, (Dkt. No. 578 at 6:18–20, 7:25–8:2); and
- took no measurements of the "prototype" and failed to otherwise document what was actually tested in 2005, (Dkt. No. 578); (Dkt. No. 581).

The same employees admitted that they never conducted a single test on the modified ET–Plus—be it a computer simulation, full-scale crash test, or anything in between—at any time before or after being made aware of Harman's allegations. *See, e.g.*, (Dkt. No. 578 at 30:22–32:18). Further, the same employees admitted to having an enormous financial stake in the continued sale of the modified ET–Plus. In fact, both Dr. Bligh and Dr. Buth acknowledged personally receiving millions of dollars directly attributable to the sales of the modified ET–Plus. *See* (Dkt. No.

---

**7.** Malizia also participated in the email exchange introduced as PX–133.

**8.** Greg Mitchell, President of Trinity Highway Products, admitted before the jury that none of the other 2005 changes between the standard ET–Plus and the modified ET–Plus (*i.e.*, the narrowing of the exit gap from 1.5–inch to 1–inch, the change in the length, the change

in the vertical height, or the change in the weld) were disclosed by Trinity to the FHWA prior to the time of trial. *See* (Dkt. No. 580 at 50:7–15 (Mitchell testifying that it was true that he did not disclose to Nick Artimovich that Trinity "had changed the length of" the ET–Plus, "changed the vertical height" or "changed the weld")).

577 at 164:10–168:24 (Bligh)); (Dkt. No. 581 at 172:3–10 (Buth)).

The jury was free to weigh such competing evidence, judge the credibility of the witnesses, and determine the veracity of the testimony presented. After considering such evidence, and after being instructed that they could render a verdict against Trinity only if they found that the company made or used a record or statement that it knew to be "untrue when made or when used," (Dkt. No. 584 at 42:16–43:5), the jury rendered a unanimous verdict finding that Trinity violated the FCA. The Court must infer that, in doing so, the jury rejected Trinity and Texas A & M's statements as untrue and/or not credible. This Court is persuaded that substantial evidence supports both such determinations and the jury's verdict finding that Trinity made false statements and engaged in fraudulent conduct in violation of the FCA.

**B. Substantial evidence supports the jury's verdict that Trinity knowingly made false and fraudulent statements.**

■ Trinity also argues that the Court should overturn the jury's verdict that Trinity violated the FCA because Harman introduced legally insufficient evidence to show that Trinity acted with actual knowledge that its claims were false or with reckless disregard as to the truth of such claims. (Dkt. No. 596 at 16). More specifically, Trinity argues that:

(1) "the evidence conclusively establishes that [Texas A & M's] omission of the detailed drawing [of the modified 4-inch ET–Plus, from the 2005 report] was an innocent mistake"; or, alternatively,

(2) Trinity cannot have knowingly submitted false or fraudulent statements because of its "reasonable reliance on the expert advice of the ET–Plus designers, the engineers at [Texas A & M]."

(Dkt. No. 596 at 17).

Both Trinity's "innocent mistake" and "blame-Texas A & M" arguments lack merit. As discussed above, Harman introduced ample evidence that Trinity–not Texas A & M–made the decision to modify the ET–Plus "without announcement." (PX–133). It was Trinity that decided to conceal that change from the FHWA (and others, including its customers and state DOTs), and it was Trinity that falsely certified that the secretly modified ET–Plus had been accepted by the FHWA. *Supra* at section IV.A.; *see also, e.g.,* (PX–133); (Dkt. No. 576 at 69–140); (Dkt. No. 578); (Dkt. No. 581 at 125–233). Further, Harman introduced substantial evidence that Trinity made this decision out of a desire to reduce its costs and increase its sales. *See, e.g.,* (PX–133).

The jury was wholly free to evaluate for itself the credibility of Trinity's and Texas A & M's claims that they made an "innocent mistake," as well as Trinity's transparent effort to throw Texas A & M under the bus. Likewise, the jury was equally free to reject these claims as false in the face of the substantial, contrary evidence introduced by Harman. In light of the jury's verdict that Trinity "knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim," (Dkt. No. 570), the Court must infer that the jury concluded that Trinity attempted to deceive the FHWA, as well as its customers, state DOTs, and the public. Trinity cannot avoid liability for that deception merely because it argued at trial that the modifications to the ET–Plus were matters of "good engineering judgment." *See United States v. Aerodex, Inc.,* 469 F.2d 1003, 1005 (5th Cir.1972) (citing *United States v. Nat'l Wholesalers,* 236 F.2d 944 (9th Cir.

1956)), *cert. denied,* 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724 (1957) ("The mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability if it can be shown that they attempted to deceive the government agency").

### C. Substantial evidence supports the jury's verdict that Trinity's false statements were material.

■ Trinity argues that Harman failed to introduce legally sufficient evidence to support the jury's verdict that Trinity's false statements were material to a demand for payment by the U.S. government. To support this argument, Trinity relies on *United States ex rel. Steury v. Cardinal Health Inc.,* 735 F.3d 202, 207 ( 5th Cir.2013), which held that, in order to recover for false certifications of compliance with federal statutes, regulations, or contract provisions, the plaintiff must show that such false certifications were "prerequisites" to payment by the federal government. Trinity then argues that "Harman has no such proof." (Dkt. No. 596 at 14). This assertion is nothing short of incredible. At trial, the president of Defendant Trinity Highway Products–Greg Mitchell– testified directly to the jury that Trinity was required to certify that the products sold for use on the National Highway System had "essentially the same chemistry, mechanical properties, and geometry as that submitted for acceptance [to the FHWA]" and that it "would meet the crash-worthiness requirements of the FHWA and the NCHRP Report 350." (Dkt. No. 580 at 69:5–24); (PX–173); (PX–216). Mr. Mitchell emphasized that such certification was essential for Trinity to sell the ET–Plus:

Q. You have to certify in writing to every single state in this country that product has been disclosed and approved by the FHWA in accordance with NCHRP 350 in order for there to be federal reimbursement for the purchase of that product; is that not correct?

A. Oh, that's absolutely correct.

(Dkt. No. 580 at 137:4–9); *see also* (*id.* at 70:19–71:15). Mark Stiles, a former Vice President of Trinity Industries, confirmed that such certifications were (and remain) necessary for Trinity to obtain payment:

Q. You understand, sir, that in order for a state to get reimbursed for the purchase of an ET–Plus that the configuration of the ET–Plus must be disclosed and approved to the FHWA. You're aware of that, aren't you?

A. Yes.

(Dkt. No. 179 a t 148:12–16). The record supports the jury's conclusions that Trinity falsely certified the modified ET–Plus sold beginning in 2005 as having been accepted and approved by the FHWA. At trial, Trinity admitted that it could not sell the ET–Plus without such certifications and that they were prerequisites to reimbursement by the federal government. Accordingly, even under Trinity's interpretation of the law, substantial evidence supports the jury's verdict. For Trinity to argue that there is no evidence that such false certifications were material, in the face of **their own witnesses' testimony,** makes the Court wonder about Trinity's underlying candor.

### D. Trinity's claim that omissions are not actionable under the FCA is both incorrect and irrelevant.

■ In addition to the arguments above, Trinity contends that Harman cannot identify a false record or statement under the FCA because Harman's case was based on Trinity's failure to disclose information to the FHWA (*e.g.,* the failed crash tests run on the ET–Plus in a flared configuration). *See* (Dkt. No. 596 at 13–14); (Dkt. No. 615 at 11). Trinity's argu-

ments must fail in the face of numerous Courts of Appeals decisions which have held that omissions can constitute false claims for purposes of liability under the FCA. *See United States v. Rogan,* 517 F.3d 449 (7th Cir.2008); *Sanderson v. HCA–The Healthcare Co.,* 447 F.3d 873, 877 (6th Cir.2006); *United States ex rel. Berge v. Bd. of Trs. of Univ. of Ala.,* 104 F.3d 1453, 1461 (4th Cir.1997). Further, and even though the Fifth Circuit has not addressed this issue squarely, Harman introduced substantial evidence that Trinity committed fraud by both omission and commission. *See supra* at section IV.A.; *see also, e.g.,* (PX–133); (Dkt. No. 576 at 69–140); (Dkt. No. 578); (Dkt. No. 581 at 125–233). Accordingly, Trinity's argument is not persuasive.

### E. Substantial evidence supports the jury's verdict that Trinity's knowingly false statements caused the government to pay out money in the amount of $175,000,000.

 Damages under the FCA are calculated under the "benefit of the bargain theory," meaning that the loss suffered by the government is measured by the difference between the amount the government bargained to receive and the value of the product or services the government actually received. *See United States v. Aerodex, Inc.,* 469 F.2d 1003, 1011 ( 5th Cir.1972) (describing measure of FCA damages as the "difference between what the government paid and what it should have paid" absent the false statement). Accordingly, "to establish damages, the government must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, but also that the performance the government received was worth less than what it believed it had purchased." *United States v. Sci. Applications Int'l Corp.,* 626 F.3d 1257, 1279 (D.C.Cir.2010); *see also United*

*States ex rel. Feldman v. van Gorp,* 697 F.3d 78, 87 (2d Cir.2012) ("In most FCA cases, damages are measured as they would be in a run-of-the-mine [sic] breach-of-contract case—using a 'benefit-of-the-bargain' calculation in which a determination is made of the difference between the value that the government received and the amount that it paid.").

At trial, Harman argued that Trinity issued 16,771 false claims between March 6, 2006, through the end of 2013; that during that time, the U.S. government paid $218,003,273 to reimburse states for purchases of ET–Plus units made in reliance on those false claims; and that the modified ET–Plus units—which had not been disclosed to, or approved by, the FHWA—had no ascertainable value other than as scrap metal. Accordingly, Harman argued that the appropriate measure of damages in this case was the $218,003,273 paid in reliance on Trinity's false claims or, alternatively, $175,037,890 (the money paid, offset by the scrap value of the modified ET–Plus units). To support these allegations, Harman relied on t he testimony of his damages expert, William Chandler.

More specifically, Mr. Chandler testified that Trinity sells the vast majority of its ET–Plus units to contractors, who in turn bill state DOTs for the costs associated with purchasing and installing the ET–Plus on the nation's highways. (Dkt. No. 579 at 159:15–161:11). Mr. Chandler further testified that the federal government then reimburses the states for between 80% and 100% of such costs. (*Id.* at 161:17–162:6); *see also* (*id.* at 139:12–140:4 (testimony of Mark Stiles confirming Trinity's understanding that the states bear the costs of installing roadside hardware and are reimbursed by the federal government)). Using the lower bound of that reimbursement rate (80%), Mr. Chandler

calculated the $218,003,273 figure recited above. (*Id.* at 158:2–20).

In the motion before the Court, Trinity attacks Mr. Chandler's analysis on two fronts: (1) Trinity argues that Chandler's testimony cannot support the jury's verdict because he failed to trace the precise amount that the federal government actually paid for modified ET–Plus units during the relevant time period; and (2) Trinity argues that Chandler's conclusion that the government received no value (or merely scrap value) from the modified ET–Plus units is based solely on an assumption.

### i. Trinity cannot escape liability simply because a perfect measure of damages is difficult or impossible to determine.

With respect to the first point, Trinity demands a level of proof that would be nearly impossible for any plaintiff to obtain within the realistic constraints imposed by the litigation process. This is, clearly, why Trinity argues for such onerous precision. However, the courts have consistently explained that the computation of damages need not be performed with mathematical precision but, rather, may be based upon a reasonable estimate. *See, e.g., United States v. Killough,* 848 F.2d 1523, 1531 (11th Cir.1988) (upholding damages award in an FCA case based on the aggregate price of 1,182 mobile home set-ups despite defendants' argument that each set-up involved unique circumstances); *United States v. Krizek,* 111 F.3d 934 (D.C.Cir.1997) (upholding damages award in an FCA case in which a liability determination based on the government's selection of 200 claims associated with seven patients was extrapolated to over 8,000 claims submitted by defendants); *G.M. Brod & Co. v. U.S. Home Corp.,* 759 F.2d 1526, 1538 (11th Cir.1985) ("The fact that such damages are difficult to measure and by their nature are uncer-

tain in amount does not render such damages unrecoverable ... this is particularly true where a party breaches his contract and seeks to escape liability merely because it is impossible for the other party to state or prove a perfect measure of damages." (internal quotations omitted)); *accord Lehrman v. Gulf Oil Corp.,* 464 F.2d 26, 45 (5th Cir.1972); *Faulk v. United States,* 198 F.2d 169, 172 (5th Cir.1952); *see also Lee Shops, Inc. v. Schatten–Cypress Co.,* 350 F.2d 12, 18 (6th Cir.1965) (holding the same in a breach-of-contract case).

Again, this is particularly true where the offending party "seeks to escape liability merely because it is impossible for the other party to state or prove a perfect measure of damages." *U.S. Home Corp.,* 759 F.2d at 1538 (internal quotations omitted). In this case, Trinity represented throughout discovery that it kept no records regarding the reimbursements actually paid by the federal government and could not possibly respond to discovery seeking a calculation of such reimbursements. *See, e.g.,* (Dkt. No. 665 at 46:12–18). Trinity averred such ignorance despite admitting that FHWA acceptance and federal reimbursement are necessary to generate Trinity's sales of the ET–Plus. *See, e.g.,* (Dkt. No. 179 at 148:12–16); (Dkt. No. 580 at 70:19–71:15, 137:4–9). Moreover, Trinity actively opposed virtually every attempt by the Plaintiff to obtain discovery in this case—going so far as to violate this Court's orders compelling production. *See* (Dkt. No. 526 at 48:17–53:12 (transcript of the Court's order sanctioning Trinity for failing to comply with the Court's previous orders compelling production)). In this context, Trinity cannot escape liability simply because Harman was unable to introduce evidence tracing exact dollar amounts of reimbursements for the ET–Plus units sold as a result of Trinity's false statements.

In the absence of any data from Trinity regarding the total reimbursements for ET–Plus units, Harman (through Chandler) was required to make reasonable estimates, based on the best available data. *Krizek,* 111 F.3d at 938; *Killough,* 848 F.2d at 1532; *Faulk,* 198 F.2d at 172–173. Chander did so, using Trinity's sales data, federal highway statistics, and other government data concerning state highway expenditures and the overall reimbursement rates for federal highway products. (Dkt. No. 579 at 157:11–172:1, 173:19–176:17). Where a range of values was available to Chandler, he used the lower, more conservative figures. *See, e.g.,* (Dkt. No. 579 at 171:8–1).

**ii. Chandler's assumption that the modified ET–Plus would have no ascertainable market value was justified under the controlling law and verified by Trinity's own testimony.**

As discussed above in the context of scienter, this case is most closely analogous to the facts in *United States v. Aerodex, Inc.,* 469 F.2d 1003 (5th Cir.1972). In that case, the defendant contracted to sell certain aircraft parts to the U.S. Navy, specifically 300 master rod bearings, for $90.00 each. *Id.* at 1005. However, the defendant failed to provide the bearings called for in its contract, instead substituting other bearings which were reworked so that they would appear indistinguishable from the items called for in the contract. *Id.* at 1006. The *Aerodex* defendant argued that it could not have acted with the requisite intent to "cheat" the government because the substitute products were "interchangeable" with those called for under the contract. *Id.* at 1007. The Fifth Circuit rejected this argument, instead holding that "[t]he mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability if it can be shown that they attempted to deceive the government agency." *Id.* at 1005 (citing *United States v. Nat'l Wholesalers,* 236 F.2d 944 (9th Cir.1956), *cert. denied,* 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724 (1957)).

The Fifth Circuit then calculated the actual damages owed in that case (under a prior version of the FCA) *for the entire cost of the bearings,* holding that:

> We think that a proper application of [the FCA as codified at the time] limits the government's claim to the amount that was paid out by reason of the false claim. *We treat the matter as if the claims for $27,000 for P/N 171815 bearings were false because those bearings were never delivered.* The government paid $27,000 for bearings it did not receive. This amount must be doubled, and the $2,000 statutory penalty must be added for each of the three invoices.

*Id.* at 1011 (emphasis added).

In this case, Harman introduced substantial evidence that Trinity substituted modified ET–Plus units in place of those approved for use on t he federal highway system and for reimbursement; that Trinity concealed those modifications; and that Trinity knowingly (and falsely) certified that the modified ET–Plus units were in fact identical to the original models. *See supra* at sections IV.A and IV.B. Even if the Court were to assume that the modified ET–Plus units were "interchangeable" with the originals—contrary to the substantial evidence introduced at trial and the Court's obligation to view that evidence in favor of the jury's verdict—*Aerodex* permits the jury to award damages for the full purchase price attributable to the false claims for reimbursement for ET–Plus units sold from 2005 through 2013, without any offset for any value attributable to the non-compliant ET–Plus units.

This case is also analogous to the facts of *United States v. National Wholesalers,* 236 F.2d 944 (9th Cir.1956). In that case (which is cited in *Aerodex* ), the defendant contracted to deliver certain Delco–Remy

generator regulators to the U.S. Army. *Id.* at 945. However, the defendant was unable to acquire the Delco–Remy generators called for in the contract, and so it substituted other generators and attached "spurious Delco–Remy" labels to them. *Id.* at 946. After reviewing the record and the trial court's order, the Ninth Circuit held that liability attached, despite the fact that the substitute generators performed to specifications, and rendered judgment awarding damages in the amount of the purchase price for the 6,600 regulators at issue. *Id.* at 951.

Finally, Mr. Chandler's assumption—that the modified and undisclosed ET–Plus units which were installed on the national highway system had no ascertainable value—was validated by Trinity at trial. Indeed, Trinity repeatedly admitted that it could not sell the ET–Plus without a certification that the device was approved and accepted by the FHWA. *See, e.g.,* (Dkt. No. 580 at 70:19–71:15, 137:4–9); (Dkt. No. 179 at 148:12–16).

Ultimately, the jury awarded $175,000,000 in damages to the U.S. government. (Dkt. No. 570). This figure is almost precisely the $175,037,890 that represents Chandler's calculations for the amount of reimbursements made in reliance on Trinity's false statements, less the scrap value of the modified ET–Plus units. Having heard testimony from Trinity that there was no viable market for ET–Plus units that were not accepted by the FHWA, the jury was free to award such damages, and the evidence before the jury supports such an award.

## V. ANALYSIS—SOUTHLAND

In addition to challenging the sufficiency of the evidence introduced at trial, Trinity also contends that the Court must overturn the jury's verdict and grant JMOL in its favor because the FHWA has at all relevant times "confirmed" that the ET–Plus is eligible for federal reimbursement. According to Trinity, the FHWA's actions mean that—as a matter of law—Trinity's various certifications asserting that the ET–Plus was eligible for federal reimbursement cannot constitute "false" statements under the FCA. *See* (Dkt. No. 596 at 3–6); (Dkt. No. 61). In making this argument, Trinity relies almost exclusively on a 2003 decision by the Fifth Circuit, *United States v. Southland Management Corp.,* 326 F.3d 669, 676 (5th Cir.2003) (en banc) (hereinafter, *Southland*).

Trinity's reliance on *Southland* is misguided. As the Court explains in detail below, the facts in this case are clearly distinguishable from those at issue in *Southland,* and nothing in the *Southland* decision conflicts with the jury's verdict that Trinity knowingly violated the FCA.

### A. The Fifth Circuit's *Southland* decision is distinguishable.

In *Southland,* the defendants executed an agreement with the U.S. Department of Housing and Urban Development (HUD). Under the HUD agreement, as well as a separate "HAP Contract," the defendants agreed to purchase and rehabilitate an abandoned apartment complex in order to provide affordable housing to low-income families. *Southland,* 326 F.3d at 671–72. The defendants further agreed to keep the apartment building "in good repair and condition" and to "maintain the [property] ... to provide Decent, Safe, and Sanitary housing." *Id.* In exchange, HUD guaranteed the defendants' mortgage and agreed to subsidize tenants' rent payments to the defendants. *Id.* at 672. Under the HAP Contract, the *Southland* defendants were required to submit monthly reports (known as "HAP vouchers") certifying that the apartments were in the required "Decent, Safe, and Sanitary condition." *Id.*

The property at issue in *Southland* deteriorated in the mid to late 1990s, and by

1996, the property received the lowest possible rating in HUD inspections. *Id.* at 673. By 1997, the *Southland* defendants were unable to continue making mortgage payments on the property and surrendered the property to HUD. *Id.* The United States subsequently brought an action against the *Southland* defendants under the FCA, alleging that nineteen HAP vouchers submitted by defendants falsely certified that the property was "decent, safe, and sanitary." *Id.* at 674. The United States further argued that each such certification constituted a false claim for payment and/or a false statement under 31 U.S.C. § 3729(a). *Id.*

The United States District Court for the Southern District of Mississippi disagreed and granted summary judgment in favor of the *Southland* defendants. *Id.* at 677. On appeal, the Fifth Circuit affirmed the district court's opinion. *Id.* at 677. After granting en banc review, a majority of the Court noted that the contract between the *Southland* defendants and HUD expressly "spelled-out" the mechanism for controlling the abatement of payment, avoiding the need to enforce the condition of the property through the FCA. *Id.* at 675.

The Court's majority further emphasized that HUD conducted multiple management reviews and their own physical inspections of the property at issue; engaged in extensive exchanges with the defendants with respect to the deteriorating state of that property; and, nevertheless, knowingly elected to continue payments under the contract in an effort to salvage the property. *Id.* at 673–74, 677. The majority of the Court held that such "undisputed conduct and exchanges by and between the parties during this entire period demonstrates, not only that the vouchers were promptly paid, but that all parties regarded them as entitled to be paid."

*Id.* at 677. In the concurring opinion, the concurring members of the Court further emphasized that the evidence in *Southland* :

> positively demonstrates beyond reasonable question that **at the time of defendants' submission** of the challenged vouchers and HUD's approval of those vouchers, **HUD, based on its own annual inspections of the property, knew full well of the very conditions of the property** which it now claims made the property not "decent, safe, and sanitary."

*Id.* at 683 (emphasis added). Based on the express terms of the contract and that undisputed course of conduct between the parties, the Southland Court held that the defendants were entitled to the payments they received. Accordingly, the nineteen HAP vouchers submitted by the defendants could not constitute false claims under the FCA. *Id.* at 675–77.

**B. The facts of this case are materially different than those at issue in Southland.**

In this case, Trinity argues that the FHWA's June 17, 2014, letter [9] constitutes a formal pronouncement by the government that the ET–Plus is—and at all relevant times has been—eligible for reimbursement. Trinity then contends that this letter alone mandates that its certifications of such eligibility cannot constitute "false" claims under the FCA. (Dkt. No. 596 at 2–6). In making this argument, Trinity ignores the fact that:

i. the FHWA's June 17 letter was "based upon all of the information available to the agency," which included incomplete, misleading, and even false information provided by Trinity; and

ii. no contract or course of conduct exists between the FHWA and Trinity

**9.** Defendants' Exhibit 2 (DX–02).

that might "spell-out" the mechanism for determining the validity of claims for, or payment for, ET–Plus units or indicate that the government approved the undisclosed modifications to the ET–Plus.

### i. The FHWA's June 17, 2014, letter was based on incomplete, misleading, and even false information.

The FHWA's June 17 letter—upon which Trinity bases virtually its entire argument—states as follows:

The Office of Safety has received inquiries from FHWA Division Offices and State DOTs regarding the Federal-aid eligibility of the ET–Plus w-beam guardrail end terminal manufactured by Trinity Highway Products (Trinity). Our September 2, 2005 letter (FHWA No. CC–94) to Trinity is still in effect and the ET–Plus w-beam guardrail end terminal became eligible on that date and continues to be eligible for Federal-aid reimbursement.

(DX–02). The letter further states that:

On February 14, 2012, Trinity confirmed to FHWA that the reduction in the width of the guide channels from 5 inches to 4 inches was a design detail inadvertently omitted from the documentation submitted to FHWA. Additionally, Trinity confirmed that the company's ET–Plus end terminal with the 4-inch wide guide channels was crash tested to the relevant crash test standards (NCHRP Report 350) at the Texas Transportation Institute (TTI) in May 2005. TTI also confirmed this information on February 14, 2012. *Therefore, based upon all of the information available to the agency* (including a reexamination of the documentation from ET–Plus crash tests), FHWA validated that the ET–Plus with the 4 inch guide channels was crash tested in May 2005. The FHWA confirmed this information

in correspondence dated October 11, 2012 to State departments of transportation in Illinois, New Hampshire, and South Carolina, and reiterated that confirmation on January 10, 2013 in a letter to AASHTO.

(*Id.* (emphasis added)).

This letter, which issued on the eve of the first trial in this action, is the first communication from the FHWA to identify the change from a 5–inch to a 4–inch guide channel. (*Id.*) On its face, the June 17 letter merely recites **Trinity's representations** that an ET–Plus with a 4–inch guide channel was crash tested in 2005, and **based on those representations**, the government concludes that "[t]he Trinity ET–Plus with 4–inch guide channels became eligible for Federal reimbursement under FHWA letter CC–94 on September 2, 2005." (*Id.*)

As described above, that 2005 letter, which is incorporated into the June 17, 2014, letter:

- expressly listed the seven modifications covered by the change in guardrail height from Trinity's 2005 test report—none of which involved a change from the standard 5–inch ET–Plus to the modified 4–inch ET–Plus;

- expressly limited the 2005 approval to "[t]he modifications described above";

- referred to the tested ET–Plus units as the "ET–Plus 31"; and

- excused Trinity from completing a full series of NCHRP Report 350 crash tests because "the original designs [*i.e.*, **the standard 5–inch ET–Plus unit**] for attachment to standard W-beam guardrail have proven to be crashworthy."

(PX–173).

However, at trial Plaintiff introduced substantial and often uncontroverted evi-

dence that Trinity made significant modifications to the ET–Plus in 2005—only one of which was the change to a 4–inch guide channel—and that Trinity failed to disclose any of those modifications to the FHWA at any time prior to 2012. *See, e.g.,* (Dkt. No. 580 at 32:12–20 (testimony of Greg Mitchell, on behalf of Trinity, admitting that "several" changes were made to the ET–Plus in 2005, none of which were reported to the FHWA)); (Dkt. No. 580 at 50:7–24 (testimony of Greg Mitchell further admitting that Trinity failed to disclose various changes to the ET–Plus at any time)); (Dkt. No. 581 at 214:7–12 (testimony of Dr. Eugene Buth, on behalf of Texas A & M, admitting that changes to the ET–Plus were not disclosed to the FHWA until 2012, if at all)); (Dkt. No. 577 at 125:25–126:15 (testimony of Nick Artimovich, on behalf of the FHWA, stating that the agency first became aware of certain changes to the ET–Plus in 2012)).

Moreover, even if the Court accepts as true Trinity's claims that it crash tested an ET–Plus with a 4–inch guide channel in 2005 and disclosed the change from a 5–inch to a 4–inch channel sometime after 2012, this was but one of the changes made to the modified ET–Plus. *See supra* section III. Trinity admitted that other changes, such as the narrowed exit gap and extended throat inlet, remained undisclosed at least through the trial in this action. *See, e.g.,* (Dkt. No. 580 at 50:7–16 (testimony of Greg Mitchell admitting that several of the changes to the ET–Plus were not disclosed to the FHWA)).

### ii. No contract or course of conduct governs the eligibility of the ET–Plus or Trinity's entitlement to payments from the federal government.

In *Southland* the Fifth Circuit determined that the contract between HUD and the defendants "spelled out [the mechanism] for controlling the abatement of the payments, and the entitlement of the Owners, when the condition of the property deteriorates." *Southland,* 326 F.3d at 675. The Fifth Circuit also held that the defendants made no "false" claims under the FCA because HUD, through *its own* inspections, was fully aware that the apartments were out of compliance with the relevant regulations, but had nonetheless agreed to make payments during the corrective action period. *Id.* at 677. The Court concluded that the contractual relationship between the *Southland* defendants and HUD, as well as the "undisputed conduct and exchanges between the parties"—which included repeated inspections of the subject property by HUD—precluded FCA liability in that case. *Id.* at 677.

In the concurring opinion, which Trinity primarily relies on, the concurring members of the Fifth Circuit further emphasized that:

- HUD "knew full well of the very conditions of the property" that led to the allegedly false claims;
- this was true "at the time of defendants' submission of the [allegedly false claims]"; and
- it was "based on *its own* annual inspections of the property."

*Id.* at 683 (emphasis added). The Court also noted that:

- "HUD was aware that this project was deteriorating for several years preceding its foreclosure";
- "[t]he types of problems emphasized by the government as creating substandard living conditions *were not hidden defects* "; and
- "HUD's policy of approving continued subsidy payments notwithstanding the project's declining condition

*was based not on its ignorance of the true condition* but upon the imperative to provide housing for the tenants."

*Id.* (emphasis added). In other words, despite such contemporaneous and personal knowledge that the claims at issue in that case could be considered false, HUD nevertheless consciously decided to continue payments under the contract that governed the agency's relationship with the defendants. *Id.* at 675–77, 83.

The facts of the case at bar stand in clear contrast to those at issue in *Southland.* There is no contract between Trinity and the FHWA that might provide a vehicle for resolving Trinity's false claims in this case. Also, and unlike *Southland,* there is no indication that Trinity communicated their compliance issues to the government or sought its help in addressing them at any time before the jury rendered its verdict. *See supra* at section IV.A. To the contrary, Harman introduced substantial evidence at trial that Trinity withheld material information regarding the ET–Plus units, concealed substantial modifications to the standard ET–Plus unit that was tested and originally approved by the FHWA, and falsely certified that the ET–Plus units were compliant. *Id.*

Further, nothing in this case approaches the multiple management reviews and personal physical inspections of the property that the *Southland* Court expressly relied on in finding that the government (through HUD) knew of those defendants' otherwise false statements and, nevertheless, elected to continue payments. *Southland,* 326 F.3d at 673–74, 677. The FHWA did not participate in any investigation into the modification of the ET–Plus or the veracity of Trinity's claims that the ET–Plus was eligible for federal reimbursement until after the jury rendered its verdict. Despite Trinity's conclusory arguments regarding the FHWA's "investigation," the substan-

tial and un-rebutted evidence introduced at trial established that none of the modifications were disclosed prior to 2012; many of the modifications were not disclosed at any time before the trial; and no testing of any kind was done to evaluate the modifications that were made. *See, e.g.,* (Dkt. No. 580 at 32:12–20, 50:7–24 (Trinity admitting that "several" changes were made to the ET–Plus in 2005, none of which were reported to the FHWA)); (Dkt. No. 581 at 214:7–12 (Texas A & M admitting that changes to the ET–Plus were not disclosed to the FHWA until 2012, if at all)); (Dkt. No. 578 at 30:22–34:13 (Texas A & M admitting that no testing was done on the modified ET–Plus units, save the failed "flared" tests—which were not disclosed to the FHWA)).

For these and all the reasons stated herein, *Southland* does not apply, let alone control, in this case, and the FHWA's June 17, 2014, letter cannot constitute an authoritative statement with respect to the acceptance of the modified ET–Plus or its "eligibility" for federal reimbursement between 2005 and 2013.

### C. Successful fraud on a government agency does not serve as an absolute defense under the FCA.

 Trinity argues that any expression of acceptance by a government agency can retroactively grant absolution for such false records or statements and, consequently, deprive the courts of jurisdiction to hear a case under the FCA. (Dkt. No. 596 at 7–10). Further, Trinity argues that this is true even where, as here, there is substantial evidence that the agency's post hoc absolution is obtained through a defendant's fraud. (*Id.*); *see also* (Dkt. No. 437 at 4–5 (arguing that even *admitted* fraud on the government can serve as a complete defense)).

The False Claims Act expressly prohibits "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The statute is directed, on its face, to punishing fraud against the government. 31 U.S.C. § 3729 *et seq.*; *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 ( 5th Cir.1997) (stating that the FCA "interdicts material misrepresentations made to qualify for government privileges or services." (internal citation and quotation marks omitted)). To hold that successful fraud on the government can bar liability would undercut the FCA completely. Such is all the more evident considering that a failed effort to defraud the government—which presumably would not elicit some expression of acceptance or approval—would offer no protection. In other words, Trinity would have this Court rule, as a matter of law, that successful fraud—but only successful fraud—inoculates the perpetrator of such fraud against liability under the FCA. This Court declines to adopt such a reading, which would effectively turn the FCA on its head.

**D. Trinity's and the FHWA's post-trial conduct is irrelevant, outside the record, and incapable of justifying a collateral attack on the jury's verdict.**

Trinity makes much of the fact that, following the trial in this action, the FHWA demanded that Trinity submit the modified ET–Plus to a series of crash tests. Such tests and other actions by the FHWA are irrelevant to the status of the modified ET–Plus in 2005, or at any time before such tests commenced. Such post-verdict tests are wholly outside the record of the trial in this case and cannot be considered by this Court. Such tests, whatever their result, did not exist before the trial and were never before the jury. They cannot constitute any part of this Court's analysis under Federal Rule of Civil Procedure 50(b).

**i. The jury made the authoritative determination that Trinity made false and fraudulent statements in order to sell the modified ET–Plus from 2005 through 2013.**

It is undisputed that Trinity: (1) modified the ET–Plus in 2005; (2) failed to disclose those modifications to the FHWA; and (3) nevertheless certified that the FHWA had accepted the modified ET–Plus for use on the highways. *See supra* at section IV. It is a truism that the FHWA cannot have "accepted" changes of which it was not aware. Moreover, there was substantial evidence introduced at trial that Trinity knowingly made such modifications in order to enhance its profits; that Trinity consciously and intentionally omitted any reference to such modifications from its communications with the FHWA; and that Trinity continued to certify the modified devices, knowing those certifications to be false. *See id.* The record, as cited above, establishes a sizeable body of evidence from which a reasonable jury could (and in this case did) reach such conclusions. None of the FHWA's statements or actions taken on the eve of trial (or after trial) can retroactively impact or undermine the jury's verdict.

There is no evidence that the FHWA became aware of any modifications to the ET–Plus until Harman notified the agency of his allegations in 2012. *See* (Dkt. No. 577 at 125:25–126:15). Moreover, there is substantial evidence that even after 2012, Trinity disputed Harman's claims with the FHWA, such that the FHWA had no clear knowledge of the true facts even after Harman published his claims to the government. A part of Trinity's response to

Harman's allegations was also to manipulate and circumscribe the information provided to the FHWA, including by insisting that virtually the entire record in this case remain under seal. As discussed in the Court's Order unsealing the record in this case, neither Trinity nor Texas A & M ultimately established any compelling need for such secrecy. *See* (Dkt. No. 665 (Transcript)); (Dkt. No. 663 (written Order)).

**ii. Trinity and the FHWA's post-trial conduct demonstrate the inapplicability of *Southland* to the facts in the trial record.**

Following the trial, the FHWA issued a series of letters concerning the ET–Plus, including a letter issued on October 21, 2014, requiring the Defendants to conduct a series of subsequent crash tests. (Dkt. No. 609–33). While such post-trial communications are not available to be used as a collateral attack on the jury's verdict, they show that the June 17, 2014, letter was anything but an "authoritative" determination by the FHWA under *Southland*. This directive for new crash tests does reveal that the FHWA did not have the same first-hand personal knowledge that HUD had in *Southland*.

Further, the FHWA's post-trial communications required Trinity to provide certain information regarding the test items and procedure. (Dkt. No. 609–56). Among the items Trinity agreed to provide was a confirmation that the modified ET–Plus units are an exact match to the terminals tested in 2005 on a 31–inch guardrail and subject to the FHWA's September 2, 2005, letter. (*Id.*) Specifically, correspondence between Greg Mitchell, the President of Defendant Trinity Highway Products, and Tony Furst, Associate Administrator for Safety at the FHWA, contained the following exchange (Mr. Furst's request appears in standard text; Mr. Mitchell's response appears in *italicized text*):

2) Dimensions.

 a. FHWA needs confirmation that the current production unit dimensions of the ET–Plus that are proposed for testing are an exact match to the dimensions tested in 2005 and 2010. *Trinity will provide.*

(Dkt. No. 609–56).

Mr. Mitchell's assertion that "Trinity will provide" confirmation that the modified 4–inch ET–Plus units to be submitted for continuing testing "are an exact match to the dimensions tested in 2005" is directly controverted by the evidence Trinity put forward at trial. In particular, witnesses from Trinity and Texas A & M testified that no measurements were taken of the 2005 test article, no drawings were created to illustrate the dimensions of the test article, and the actual head used in the 2005 testing was destroyed. *See* (Dkt. No. 576 at 82:25–83:20); (Dkt. No. 578 at 6:3–20); (Dkt. No. 580 at 60:4–25); (Dkt. No. 582 at 136:19–137:16); (PX–141). If Trinity can now provide such concrete assurances, then the question must be asked whether they hid information which at trial they claimed did not exist.

6) Additional information.

 a. FHWA's letter of 10/21/14 (para. 5 of the attachment) calls for additional information by 11/11/14. In what form should FHWA expect this material to arrive by that date. *Trinity will provide the requested information by that date. Given the volume of data (videos, etc.) it will be sent via mail courier. Trinity advised that the R & D crash tests on the flared version of the ET–Plus system were owned by Texas Transportation Institute and FHWA should contact Texas A & M University to*

*acquire those test videos and results.*

(Dkt. No. 609–56 at 3). Throughout the trial, Trinity and Texas A & M were represented by the same attorneys. They have been represented by the same attorneys for purposes of the ongoing post-trial proceedings. *See, e.g.,* (Dkt. No. 633 (Notice, filed January 30, 2015, indicating that counsel for Trinity "also continue to represent non-parties Texas A & M University and its member, Texas A & M Transportation Institute")). In this context, Trinity's suggestion to the FHWA that the relevant crash-test videos are not in their custody or control is difficult to accept.[10]

Further, the crash-test videos that Defendants have refused to produce directly to the FHWA were admitted as exhibits during the trial and discussed at length in open court in the presence of the public, including members of the media. (Dkt. No. 578 at 24:8–27:22). Nevertheless, both Defendants and Texas A & M filed motions with this Court seeking to prevent public access to those same materials.[11] The Court has previously rejected Trinity's efforts to prevent public access to this information and will not repeat that analysis here. *See* (Dkt. No. 663); (Dkt. No. 665).

The Court is now concerned that Trinity may have withheld information at trial regarding the modified ET–Plus and, specifically, the 2005 tests allegedly run on such end terminals, despite extended discovery

fights and multiple orders from the Court to produce all such material.

## E. Trinity's procedural defenses lack merit.

Trinity further argues that Plaintiff's FCA claims fail as a matter of law because (1) Plaintiff did not allege in its complaint that the June 17 letter was obtained through fraud; and (2) Plaintiff did not bring a complaint to the FHWA regarding the issuance of the June 17 letter. With respect to the first point, Trinity misunderstands the nature of Plaintiff's claims. The actionable fraud in this case is Trinity's certification that the ET–Plus that it has sold since 2005 was approved by the FHWA. *See, e.g.,* (Dkt. No. 580 at 32:12–20); (Dkt. No. 580 at 50:7–24); (Dkt. No. 581 at 214:7). Faced with this evidence, Trinity admitted that its certifications were false and that, without those false certifications, Trinity could not have sold the ET–Plus. (Dkt. No. 579 at 139:12–140); (Dkt. No. 580 a t 70:19–76:10, 137:4–9). Harman's allegations that the June 17 letter was obtained through fraud go to the weight that the jury could afford such evidence.

▇▇▇ With respect to the second point, the FCA merely requires a *qui tam* relator, like Harman, to provide the government with a "copy of the complaint and written disclosure of substantially all material evidence and information the person possesses . . . to give [the government] the

---

**10.** Trinity attempted the same conduct during pre-trial proceedings before the Court, treating Texas A & M as either wholly aligned with Trinity or as a completely independent third party depending on which position was advantageous at the time. *See* (Dkt. No. 533 at 36:21–38:23).

**11.** *See* (Dkt. No. 59); (Dkt. No. 598). Defendants and Texas A & M specifically attempt to maintain a seal preventing public access to documents concerning the testing of the mod-

ified ET–Plus in a flared configuration. *See, e.g.,* p. 9 (Defendant's list of "Document[s] or Excerpt[s] to Remain Sealed," featuring at least six docket entries that Defendants seek to maintain under seal expressly because they concern the "Flared ET–Plus")); (Dkt. No. 598–1 (Texas A & M's list of "Document[s] or Excerpt[s] to Remain Sealed," featuring at least eight docket entries that Texas A & M seeks to maintain under seal expressly because they concern the "Flared ET–Plus.")).

opportunity to intervene." *See United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 175 (5t h Cir.2004) (internal citations omitted). Such requirements associated with bringing an FCA claim do not impart an ongoing duty to monitor the Defendants' fraudulent activities and re-plead every specific instance of such fraud. These purely procedural arguments are not persuasive.

## VI. CONCLUSION

From 2005 through trial, Trinity certified that the ET–Plus units it sold had been tested and approved in accordance with NCHRP Report 350 standards. As an integral part of such certifications, Trinity represented to its customers; to local, state, and federal governments; and to the driving public that the modified ET–Plus units it was selling "replicated" the standard ET–Plus units it crash tested and submitted for approval to the FHWA in 1999. After a six-day trial, the jury rendered a unanimous verdict that such certifications were false; that Trinity knew that they were false at the time they made them; and that the knowingly false certifications were material to the government's decision to pay $175,000,000 dollars to reimburse states for modified ET–Plus units sold during the relevant time. For all of the reasons stated above, that verdict is supported by substantial evidence, and the Court finds nothing in the controlling law which compels that the verdict be set aside. Accordingly, Trinity's Renewed Rule 50(b) Motion for Judgment as a Matter of Law (Dkt. No. 596) is **DENIED**.

**So ORDERED and SIGNED this 9th day of June, 2015.**